68 N.J. Super. 135 (1961)
171 A.2d 676
PINE GROVE MANOR, SECTIONS NOS. 1, 2, 3, 4 INC. (CORPORATIONS OF THE STATE OF MARYLAND), PLAINTIFFS-APPELLANTS,
v.
DIRECTOR, DIVISION OF TAXATION, DEPARTMENT OF THE TREASURY, STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 17, 1961.
Decided June 12, 1961.
*137 Before Judges GOLDMANN, FOLEY and LEWIS.
Mr. Irving Friedman argued the cause for plaintiffs-appellants.
Mr. Alan B. Handler, Deputy Attorney General, argued the cause for defendant-respondent (Mr. David D. Furman, Attorney General of New Jersey, attorney for defendant-respondent; Mr. Alan B. Handler, of counsel and on the brief).
The opinion of the court was delivered by LEWIS, J.A.D.
Plaintiffs claim tax exemption under N.J.S.A. 54:10A-3(d), a provision of our statute commonly *138 referred to as the Corporation Business Tax Act. They are four nonstock corporations which were organized and incorporated on February 24, 1956, pursuant to the laws of the State of Maryland and under the respective corporate names of Pine Grove Manor, Section No. 1, Inc., Pine Grove Manor, Section No. 2, Inc., Pine Grove Manor, Section No. 3, Inc., and Pine Grove Manor, Section No. 4, Inc. On March 3, 1956 they complied with R.S. 14:15-3 to the extent that they made application for and obtained a certificate of authority to do business in the State of New Jersey.
Each of the four plaintiff corporations owns a section of land in Franklin Township, Middlesex County, New Jersey, upon which has been constructed a garden-type apartment building consisting of approximately 100 apartments. The total enterprise involved an estimated 400 apartments which were constructed, financed and insured as a National Housing Act project. New Jersey franchise tax returns were filed and corporate business taxes were paid for the years 1957, 1958 and 1959. In February 1958 plaintiffs filed a refund claim, alleging that these taxes were paid erroneously, as plaintiffs were exempt from such taxation.
On March 10, 1959 the Corporation Tax Bureau of the State Division of Taxation denied their demands for refund, and from that determination an appeal was taken, on June 8, 1959, to the Division of Tax Appeals in the Department of the Treasury where the matter was assigned, for review, to a single member of the Division pursuant to N.J.S.A. 54:2-41.1 and Rule 16:8-10.100 of the Division of Tax Appeals. A hearing was held on March 30, 1960 before Commissioner Ellis M. Kopp, who, after considering the evidence, the briefs submitted and the argument of counsel, filed a written opinion, and rendered judgment affirming the conclusions of the Supervisor of the Corporation Tax Bureau.
The Commissioner found and determined that the plaintiffs were not entitled to the claimed exemption because the *139 Maryland statute under which they were incorporated was not a "general or special law similar to Title 15, 16 or 17 of the Revised Statutes" of this State.
The appeal to this court is from the final judgment of the Commissioner, and the plaintiffs here contend that: (1) they were incorporated under the Nonstock Corporation Act of the State of Maryland which is a law similar to the laws of New Jersey relating to corporations and associations not for pecuniary profit; (2) they were organized as nonprofit corporations; (3) they are not conducted for the pecuniary profit of any private individual or shareholder; and (4), accordingly, (a) the judgment below should be reversed, (b) the taxes paid should be refunded, (c) they should be adjudged exempt corporations, and (d) they should be removed from the tax roster of the Corporation Tax Bureau of the State of New Jersey.
It was stipulated that all exhibits and documents admitted into evidence (which include in particular the corporation instruments relating to Pine Grove Manor, Section No. 4, Inc.) would be identical for each of the four corporations, and that the four cases should be tried together. There is no substantial dispute as to the facts, and the questions of law are common to each of the four plaintiffs.

I.
The particular provision of the New Jersey Corporation Business Tax Act, which is the subject of appeal, is stated in these words:
"The following corporations shall be exempt from the tax imposed by this act:

* * * * * * * *
(d) nonprofit corporations, associations or organizations established, organized or chartered, without capital stock, under the provisions of Titles 15, 16 or 17 of the Revised Statutes, or under a special charter or under any similar general or special law of this or any other State, and not conducted for pecuniary profit of any private shareholder or individual;" N.J.S.A. 54:10A-3(d).
*140 It should be noted that Title 15 of our statutes relates to corporations and associations not for profit, and that Titles 16 and 17 are not applicable to the case sub judice, as the former deals with religious corporations and associations, and the latter concerns corporations and institutions for finance and insurance. Subdivision (d) of the quoted statutory provision, supra, expresses a legislative mandate, and its language is clear and unmistakable. In order to justify an exemption, a domestic nonprofit company organized without capital stock under Title 15, or a foreign corporation organized under a similar general or special law of another state, must not be conducted for the pecuniary profit of any private shareholder or individual.
Title 15 of the New Jersey Revised Statutes is captioned  "Corporations and Associations Not For Profit." The first provision of the act reads:
"Any five or more persons, societies, associations, corporations or clubs may form a corporation for any lawful purpose other than for pecuniary profit, upon making, recording and filing a certificate of incorporation in writing as hereinafter provided." R.S. 15:1-1. (Italics supplied)
The plaintiffs were incorporated under the Annotated Code of Maryland, Article 23 (Corporations), Part II (Nonstock Corporations), Sections 132 to 138. The provisions salient to this review are:

"Sec. 132. General law.
(a) Compliance with regulations of stock corporations and particular classes of corporations.  Except as otherwise provided in this Part II, every corporation of this State without capital stock shall comply with all provisions of Part I, Stock Corporations, and Part III, Particular Classes of Corporations, of this article, in so far as they are applicable.
(b) `Stockholder,' etc., includes `members'.  Wherever the term stockholder, holder of shares, or other equivalent words are used in this article, they shall be deemed to include members, unless the context otherwise requires." Ann. Code, 1951, sec. 128; 1951, ch. 135, sec. 200; 1953, ch. 405, sec. 1.

*141 "Sec. 133. Charter provision.
Every corporation of this State without capital stock, formed after June 1, 1951, shall specifically provide in its charter that it is not authorized to issue capital stock." Ann. Code, 1951, sec. 129; 1951, ch. 135, sec. 201.

"Sec. 137. Restrictions on property holdings.
No provision contained in the charter of any charitable or benevolent society or corporation of this State, existing on June 1, 1951, whether incorporated under any general or special law of this State, purporting to limit or restrict the tenure or enjoyment of property or income, shall, after June 1, 1951, be effective to limit or restrict the right of such corporation to hold, enjoy, use and deal with any property and income in any way; and all such provisions are hereby annulled and revoked." Ann. Code, 1951, sec. 133; 1951, ch. 135, sec. 205.
Nowhere in these sections or throughout Part II of the Maryland code dealing with nonstock corporations is any reference made to the term "nonprofit," nor is any language used which could be reasonably construed to prohibit or limit nonstock corporations from engaging in profit-making enterprises. To the contrary, section 137, supra, negates the idea of any such intended restrictions. It is also significant that the code provisions relating to nonstock corporations specifically incorporate, by reference, where applicable, the provisions of Part I and Part III of Article 23, which parts deal respectively with stock companies and special statutory corporations.
That the legislature of Maryland, under some circumstances, recognizes nonprofit corporations is to be evinced from Article 23, Part III, section 371, wherein certain cooperative associations organized under that part of the code may elect to operate on a nonprofit basis. If the Maryland legislature had intended to make any such distinction with relation to companies incorporated pursuant to Part II (nonstock corporations), under which plaintiffs were incorporated, it is only reasonable to assume that it would have done so, and the statute would certainly have been worded differently. The force of the maxim expressio unius est exclusio alterius is strengthened by contrast "where a thing is provided in one part of the statute and omitted in another." United States *142 v. Wiltberger, 5 Wheat. 76, 18 U.S. 76, 5 L.Ed. 37 (1820); 2 Sutherland Statutory Construction (3d ed. 1943), sec. 4915.
Our attention has been directed in plaintiffs' brief to numerous provisions of the Maryland code that are allegedly comparable to the New Jersey act relating to associations and corporations not for profit. These similarities, for the most part, relate to incorporation details, form and procedure, which are clearly overshadowed by essential distinguishing characteristics. Indeed, it could be urged that there are many similarities between the New Jersey Title 15, under which nonprofit corporations are chartered, and our General Corporation Act, known as Title 14; but there is a controlling distinction  the nonprofit element. Similarities, no matter how manifold, must yield to the paramount elements distinguishing the two statutes in their essential objectives.
Plaintiffs maintain that the word "similar," as used in N.J.S.A. 54:10A-3(d), means "nearly corresponding; resembling in many respects; somewhat alike"; citing Black's Law Dictionary (3d ed.). This dictionary continues the definition of "similar" 
"Also, sometimes, exactly like; identical; exactly corresponding (at least in all essential particulars). Fletcher v. Interstate Chemical Co., 94 N.J. Law 332, 110 A. 709; Stowell v. Blanchard, 122 Me. 368, 119 A. 866, 868; Commercial Nat. Bank of Checotah v. Phillips, 61 Okl. 179, 160 P. 920, 921. Thus, a statutory provision in relation to `previous conviction of a similar offense' may mean conviction of an offense identical in kind. Com. v. Fontain, 127 Mass. 454."
This word, as used in reciprocal statutory legislation, does not require identical legislative language. There is an implied allowance for some degree of difference. Proctor v. Sachner, 143 Conn. 9, 118 A.2d 621 (Sup. Ct. Err. 1955); McLaughlin v. Poucher, 127 Conn. 441, 17 A.2d 767 (Sup. Ct. Err. 1941). It has been said to be a synonym for the word "like." Castell v. United States, 20 F. Supp. 175, 179 (S.D.N.Y. 1937), reversed 98 F.2d 88 (2 Cir. 1938), certiorari denied 305 U.S. 652, 59 S.Ct. 244, 83 L.Ed. 422 *143 (1938). In Commonwealth v. Fontain, 127 Mass. 452 (Sup. Jud. Ct. 1879), the word "similar" was held to "denote sameness in all essential particulars." See, also, Annotation 17 A.L.R., Similar, p. 94; Piaget-Del Corp. v. Kulik, 133 N.J.L. 485 (Sup. Ct. 1945).
Ample evidence is in the record to support the Commissioner's finding and determination that an essential difference exists between the statutes of the two states, particularly in view of the provisions of the Maryland code which, in effect, would "render inoperative any provision contained in the certificate of incorporation restricting profit-making." The dissimilarity between the two acts is substantial and fundamental. The New Jersey act mandates the element of nonprofit, while the Maryland code specifically nullifies such a corporate limitation.
This court, adhering to N.J.S. 2A:82-27, 28 has taken judicial notice of the sections of the Annotated Code of Maryland as pleaded and briefed, and has also informed itself by an examination of the entire Article 23 of the code. No provision in the code and no judicial authority of Maryland have been found, or called to our attention, opposed to such an interpretation of the Maryland code.

II.
The Commissioner made no findings of fact or determinations with respect to the contentions of the plaintiffs that they were organized as nonprofit corporations, and that they are not conducted for the pecuniary profit of any private shareholder or individual. These questions have been raised on appeal, and are pertinent to the controversy. The record is adequate and the circumstances impel us to resolve these issues. R.R. 4:88-13 and 1:5-4(b). The evidence and theory, upon which plaintiffs predicate their claims to be nonprofit corporations, stem from three principal sources, i.e., the provisions of the National Housing Act, their respective by-laws and articles of incorporation, and the *144 annual franchise tax exemptions they enjoy under the Maryland code.
The plain objectives of the National Housing Act were to stimulate the building trades and to increase employment, United States v. Emory, 314 U.S. 423, 62 S.Ct. 317, 86 L.Ed. 315 (1941); to provide housing accommodations designed principally for residential use, The Darlington, Inc., v. Federal Housing Administration, 142 F. Supp. 341 (E.D.S.C. 1956), reversed 352 U.S. 977, 77 S.Ct. 381, 1 L.Ed.2d 363 (1957); and to construct housing in great quantities in areas where industries are located, Boosman v. United Bldg. Co., 109 Cal. App.2d 486, 241 P.2d 58 (Ct. App. 1952).
In 1950 Congress adopted an amendment to the act, known as Title 2, Section 213, authorizing the Federal Housing Administration to insure certain mortgages covering cooperative apartments of eight units or more. 64 Stat. 54 (1950), as amended 12 U.S.C.A. Sec. 1715e. This enactment "firmly established the policy that federal aid to middle-income co-ops would be limited to mortgage insurance, that is, to the encouragement of private lending." 68 Yale L.J. 542, 553 (1958-1959). A condition of such insurance, however, is that the mortgaged premises be held by:
"(1) a nonprofit cooperative ownership housing corporation or nonprofit cooperative ownership housing trust, the permanent occupancy of the dwellings of which is restricted to members of such corporation or to beneficiaries of such trust; * * *." 12 U.S.C.A. Sec. 1715e(a)(1). (Emphasis supplied)
The Foundation for Cooperative Housing, a nonprofit membership organization, was organized to sponsor section 213 cooperative housing and to engage in research and educational work in that field. Its service agency is known as the F.C.H. Company, Inc. Plaintiff corporations were organized through the efforts of the F.C.H. Company, with the trustees of the Foundation acting as the original directors of the several plaintiff corporations. They were formed under the Maryland law as nonstock corporations for the *145 professed purpose of providing "mutual-ownership" housing under regulations promulgated by the Federal Housing Administration. For reference to such regulations, see 24 C.F.R. 241.1, et seq.
The F.H.A. financing was accomplished through insuring the first mortgages placed with The Dime Savings Bank of Brooklyn which represented 95% of the cost including land acquisition, construction and related expenses. The balance of the total cost was contributed by the prospective tenants who purchased certificates of regular membership. Thus, each tenant became an investor and made a capital contribution. There are two types of membership certificates issued by the several corporations: (1) five preferred certificates (subscription price $20 each) were issued to the Commissioner of the Federal Housing Administration in order that he might exercise financial control and regulatory supervision over the project until repayment of the insured mortgage; and (2) 113 regular certificates (subscription price $300 as to two sections and $400 as to the remaining two sections) were made available only to those signing a renewable, long-term proprietary lease for apartment occupancy. The right of occupancy is an incident of ownership.
In lieu of rent the tenants pay monthly their proportionate share of the "carrying charges," based upon the total cost of maintenance, interest, mortgage amortization, insurance premiums, taxes and reserves. Management estimates the monthly charges and any excess collections are refunded to the members. If a member desires to leave the project, the corporation has a 30-day option right, but not the obligation, to repurchase the member's certificate at book value. If the company does not exercise such option, or waives in writing its right to purchase, the same may be sold to any person who has been duly approved as a member. The affairs of the corporation are governed by a board of directors, a majority of whom must be members of the corporation.
It is conceded that plaintiffs are regulated by the Federal Housing Administration. Accordingly, they argue *146 that they must operate on a nonprofit basis; ergo, they are nonprofit corporations. This does not necessarily follow. The federal act, supra, does not require that owner corporations be organized as corporations not for pecuniary profit, rather it provides that they be "nonprofit cooperative ownership housing" corporations.
Plaintiff corporations were not created to operate at a loss or merely to break even. If their income were limited to actual expenses, a fund would never be made available for the amortization of the F.H.A. insured mortgage, depreciation and cumulative reserves. They are in the housing business for the benefit of their mutual-cooperative owners within the scope of the declared objectives of the National Housing Act. The obvious limitation upon making profit is a restriction against profit except as may be permitted by the rules and regulations of the Federal Housing Authority incident to cooperative ownership housing, during the period of time that its mortgage insurance remains outstanding. This is consistent with the whole tenor and intendment of the Housing Act, and the raison d'etre for its enactment.
There has not been any official agency determination that plaintiffs are nonprofit corporations and, even if there had been, it would not generally be considered as binding on the courts. 21 C.J.S. Courts § 208, p. 379; 1 Davis, Administrative Law, sec. 5.05, p. 314, et seq.
If, under the F.H.A. regulations, plaintiff corporations had to be established under an act not for pecuniary profit, then their incorporation under the Annotated Code of Maryland would fall short of such a test. It is a matter of general observation that nonstock and cooperative corporations are commonly engaged in profit-making activities. 1 Fletcher, Cyclopedia Corporations (perm. ed.), sec. 68, p. 234; Peer, "Cooperatives and Proprietary Corporations Distinctions Without a Difference," 34 Cornell L.Q. 416 (1948-1949).
The by-laws and articles of incorporation do not sustain plaintiffs' contention. Several provisions thereof militate *147 against any reasonable conception of a purely nonprofit corporate status. The purpose clause of the by-laws provides:
"The purpose of this corporation is to provide its members with housing on a cooperative and nonprofit basis consonant with the provisions set forth in its Articles of Incorporation."
It is observed that the said stated purpose does not characterize a nonprofit corporation, but rather "housing on a cooperative and nonprofit basis consonant with the provisions set forth in its Articles of Incorporation." Article VII, Section 3, of the by-laws dealing with book value states the formula for determining the "net worth" of a membership, the same being:
"(1) The downpayment made by the member (excluding the part applicable to working capital), plus
(2) The Member's share of principal amortization on the mortgage, plus
(3) The Member's share of surplus and reserve accounts, minus
(4) The Member's share of depreciation of the Corporation's assets as a whole as shown by the most recent balance sheet of the Corporation prepared in accordance with the FHA Uniform System of Accounts."
The articles of incorporation, in identifying the corporate objectives, declare:
"THIRD: * * * (a) to create a Corporation to provide housing for rent on a mutual ownership bases, or for sale, * * *. So long as any property of this Corporation is encumbered by a Mortgage or Deed of Trust insured under the National Housing Act or held by the Commissioner it shall engage in no other business than the construction and operation of a housing project, all on a non-profit basis; * * *."
Again, we have a statement qualifying the purported nonprofit features. The business of the corporation is limited to housing for rent or sale on a mutual ownership basis and only "so long as" the F.H.A. insurance continues.
Moreover, the FIFTH article, Section 5, of the articles of incorporation, which concerns dissolution, reads:
*148 "In the event of any voluntary or involuntary liquidation or dissolution of the Corporation, the holders of the Preferred Memberships shall be entitled to receive for each Preferred Membership, out of the assets of the Corporation available for distribution to its members, whether from capital, surplus or earnings, an amount equal to the subscription price of each Preferred Membership, before any distribution of such assets shall be made to the holders of the regular memberships."
We should bear in mind that the preferred certificates are held by the Commissioner of the Federal Housing Administration; they are five in number and the subscription price is $20 each; so that after a total redemption payment of $100 the entire net assets of the corporation, upon liquidation, would be available for distribution to the then existing regular certificate holders.
The Supreme Court of Ohio, in Celina & Mercer County Telephone Co. v. Union-Center Mut. Telephone Ass'n., 102 Ohio St. 487, 133 N.E. 540, 542, 21 A.L.R. 1145 (Sup. Ct. 1921), posed and answered the following questions:
"How may it be determined whether a corporation or association is one for profit or not for profit? Does the filing of Articles of incorporation, in which the declaration is made that it is not for profit, and on which the charter is issued, govern or determine this question? Is the issuance or nonissuance of capital stock controlling, or is it whether a business is to be engaged in and operated with consideration of the character of that business, and the method of conducting it, that is the true test?"
Said the court, "We think the latter."
This case was cited with approval and quoted in part in a later decision by the same court, State ex rel. Russell v. Sweeney, 153 Ohio St. 66, 91 N.E.2d 13, 16, 16 A.L.R.2d 1337 (Sup. Ct. 1950) wherein the court held: "In the matter of incorporation the controlling question, of course, is not what part of its authority probably will actually be exercised by the corporation but rather what authority it actually possesses and may exercise under the articles recorded." The purpose clause of the certificate of incorporation, which was in question, contained this language:
*149 "To promote the social welfare of the community * * *; and to secure the benefits of home ownership to the present inhabitants of the area * * *.
Each person becoming a member of this corporation agrees thereby, as a condition of membership, that any surplus receipts of the corporation which might otherwise in any way inure to his benefit as pecuniary gain or profit, may not be accepted or received by him as such member."
In the first sentence of the articles of incorporation the relators stated that they desired to form a corporation not for pecuniary profit. The court declined to accept the self-designating statements as conclusive with respect to the character of the corporation and then proceeded to quote from the opinion in the case of State ex rel. Troy v. Lumbermen's Clinic, 186 Wash. 384, 58 P.2d 812, 816 (Sup. Ct. 1936):
"Profit does not necessarily mean a direct return by way of dividends, interest, capital account, or salaries. A saving of expense which would otherwise necessarily be incurred is also a profit to the person benefited. If respondent renders to its incorporators or members, or to businesses in which they are interested and in whose profits they share, a service at a cost lower than that which would otherwise be paid for such service, then respondent's operations result in a profit to its members."
In the Troy case, there was a proceeding instituted by the prosecuting attorney by way of information in quo warranto. The Lumbermen's Clinic, a corporation, was charged with illegally and unlawfully entering into contracts for medical and first-aid services, the information charging that the respondent had no right to make such contracts, it not being a hospital association. The court concluded that the objectives of the corporation were utterly at variance with the preamble of the articles of incorporation. The fact of incorporation under the Non-pecuniary Profit Act is not conclusive proof that the corporation is exempt from taxation. Dana College v. State Board of Tax Appeals, 14 N.J. Misc. 308 (Sup. Ct. 1936), affirmed 117 N.J.L. 530 (E. & A. 1936); Fairmount Hospital, Inc., v. State Board of Tax Appeals, 122 N.J.L. 8 (Sup. Ct. 1939), affirmed 123 N.J.L. 201 (E. & A. 1939).
*150 "Subterfuges and devices whereby a corporation allows its profits to be diverted to those owning it, though not in the form of dividends, would, of course, disqualify it from being classed as a nonprofit corporation." Harry Alan Gregg, Jr., Family Foundation, Inc., v. Commissioner of Corporations and Taxation, 330 Mass. 538, 116 N.E.2d 146, 150 (Sup. Jud. Ct. 1953). A nonstock corporation was involved in the litigation in State ex rel. Attorney General v. Home Co-operative Union, 63 Ohio St. 547, 59 N.E. 220 (Sup. Ct. 1900). The company claimed to be in the nonprofit category, alleging that it was created for the purpose of dealing in real estate on the cooperative plan. Its avowed purpose (proclaimed in its articles of incorporation) was to assist its members in acquiring homes and to operate without profit. The per curiam decision of the court was that the organization of cooperative companies for the purpose of dealing in real estate was necessarily for profit.
We do not consider Read v. Tidewater Coal Exchange, 13 Del. Ch. 195, 116 A. 898 (Ch. 1922), relied upon by plaintiffs, as supporting their position. A careful analysis of that case clearly demonstrates that the defendant therein was a non-capital stock and nonprofit corporation. Its members were shippers, trans-shippers and consignees of bituminous coal at the Tidewater ports of New York, Philadelphia and Baltimore. Coal was not bought or dealt in by the Exchange which handled no moneys except amounts calculated to cover the actual net costs of its operation. It did not acquire or possess any property except such as might be described as office equipment. It was merely a trade agency created and maintained by the railroads and coal shippers to assist in alleviating the general adverse conditions at Tidewater points. The facts are palpably distinguishable from those presently before the court. For a collection of additional authorities see Annotation 16 A.L.R.2d, Nonprofit purposes and character which warrant creation of nonprofit corporations, p. 1345.
*151 The fact that the Annotated Code of Maryland (Article 81, section 197) exempts nonstock domestic corporations from payment of an annual franchise tax is not controlling upon this court with respect to foreign corporations doing business in this State and their corporate assets here located. Plaintiffs do not claim exemption from local taxes under N.J.S.A. 54:4-3.6. Cooperatives are not wholly exempt from federal income taxes. See Note, "Federal Income Taxation," 61 Harv. L. Rev. 1420, et seq. (1947-1948).

III.
The tenants, regular certificate holders, are the primary and exclusive beneficiaries of the cooperative housing projects which are operated by the plaintiff corporations. The record divulges numerous profitable advantages that inure to their benefit. To illustrate: (1) they are furnished with low-cost housing accommodations at monthly payments lower than the prevailing rental market, all of which is made possible by long-term government financing aid; (2) their monthly payments include a proportionate contribution toward 
(a) the real estate taxes and mortgage interest, deductible for federal income tax purposes, which deductible items have been estimated to be $500 a year for each certificate holder,
(b) the replacement reserve of $519.17 per month for each corporation,
(c) the general operating cumulative reserve of 3% of monthly receipts, and
(d) the mortgage amortization payments which increase monthly the equity in the corporate assets; (3) their investment has a book value and the net worth thereof is determined by a fixed formula as stated in the by-laws; (4) in case a member desires to sell his certificate and the corporation does not exercise its 30-day option right to repurchase, there is no limitation on the purchase price; (5) upon liquidation or dissolution of the corporation, they *152 would participate proportionately in the final distribution of the net assets of the corporation, which conceivably could be substantial, particularly if a profitable sale be made after a full or sizeable reduction of the mortgage encumbrance; (6) the F.H.A. mortgage is subject to prepayment, whereupon the governmental controls and restrictions terminate; (7) equity distributions may be made to the certificate holders in case of the total destruction of the apartment buildings by fire; (8) they have an interest in the residual receipts from vending machines, washing and drying machines, non-dwelling facilities, etc., and the surplus funds which, after reserves and obligations, are distributable to members, "in the form of reduced carrying charges or reduced sales prices of the dwelling accommodations, or patronage refunds." See 24 C.F.R., sec. 241.25.
These enumerated acquirements are real and potential and should not be considered as being indefinite or intangible; they result from the commercial activities of a nonstock cooperative housing corporation operated for the financial and social betterment of its members. These are profitable benefits, current and progressive. It is of real significance that upon corporate liquidation the certificate holders, who are the capital investors, participate in the distribution of net corporate assets. The contention of plaintiffs that they are corporations "not conducted for pecuniary profit of any private shareholder or individual" is inconsistent with the foregoing facts.
The policy of our Legislature was expressed in the "Limited-Dividend Housing Corporations Law" adopted in 1949. See N.J.S.A. 55:16-1 et seq. Under this act, stockholders are permitted limited dividends, and section 18 thereof allows special tax exemptions. Furthermore, section 5 includes an enactment that:
"* * * Upon the dissolution of such corporation any surplus in excess of such amounts shall be paid to the State of New Jersey; provided, however, that the authority may enter into agreements with any municipality where tax exemption is provided pursuant to *153 section 18 of this act with respect to any project or projects of such housing corporation for the distribution to and apportionment of said surplus between the State and the municipality."
The pattern seems clear that where the Legislature intends a nonprofit cooperative project to enjoy tax privileges the same is spelled out in the legislation, and any ultimate benefits upon dissolution are vested in the public and not the individual beneficiaries of the project. A similar provision is contained in the New York act, which requires that "surplus remaining upon dissolution after payment of the par value of the stock plus accrued, unpaid dividends and interest, shall go to the State or municipal treasury." N.Y. Public Housing Law, section 185. Vide, "Some Legal Aspects of Cooperative Housing," 12 Law and Contemporary Problems 127, 129 n. 11 (1947).
Our courts have considered the ultimate distribution of assets, in case of dissolution, as an important factor in determining local tax exemption claims on behalf of alleged nonprofit corporations. See Kimberley School v. Town of Montclair, 2 N.J. 28, 44 (1949); Fairmount Hospital, Inc., v. State Board of Tax Appeals, supra.
The plaintiffs seek a tax exemption. The law admits of no doubt that "exemption should only be allowed where the right to it is clear and unequivocal." Consumers' Research, Inc., v. Evans, 128 N.J.L. 95, 98 (Sup. Ct. 1942), affirmed 132 N.J.L. 431 (E. & A. 1944). Our Supreme Court in General Electric Co. v. City of Passaic, 28 N.J. 499, 511 (1958) said that "the taxpayer's claim of exemption must be carefully scrutinized and if the particular circumstances disclose that the statutory policy is not being furthered the exemption must be denied." The court, in its opinion, quoted with approval, at page 512, a summary statement from City of Trenton v. State Board of Tax Appeals, 127 N.J.L. 105, 106 (Sup. Ct. 1941), affirmed City of Trenton v. Rider College, 128 N.J.L. 320 (E. & A. 1942):
*154 "The applicable legal principles present no difficulty. The right to the claimed statutory exemption depends entirely upon the facts and circumstances of each particular case. Dana College v. State Board of Tax Appeals, 14 N.J. Misc. 308, 310, 184 A. 412; affirmed 117 N.J.L. 530, 189 A. 620. Since statutes granting exemption from taxation are in the nature of a `renunciation of sovereignty,' and are at war with the sound basic principle that the `burden of taxation ought to fall equally upon all,' they are most `strongly construed' against those claiming exemption. Thus the facts and circumstances in each case must clearly and convincingly establish the right to exemption within the statute granting exemption, otherwise the general rule is invoked which subjects `all property to a just share of the public burdens.' Princeton Country Day School v. State Board, etc., 113 N.J.L. 515, 517, 175 A. 136; Carteret Academy v. State Board of Taxes and Assessment, 102 N.J.L. 525, 133 A. 886; affirmed 104 N.J.L. 165, 138 A. 919. Otherwise stated, the proofs must be `free from fair doubt.' Carteret Academy v. State Board, etc., supra (102 N.J.L., at page 529). The burden of proof is upon the claimant to establish the asserted right to exemption. Dwight School of Englewood v. State Board of Tax Appeals, 114 N.J.L. 594, 599, 177 A. 875, affirmed 117 N.J.L. 113, 187 A. 36."
Plaintiffs have not carried the necessary burden. We conclude that they are not nonprofit corporations under the provisions of Title 15 of the Revised Statutes of this State or under any similar general or special law of any other state, and that the record fails to establish that they are not conducted for pecuniary profit of any private shareholder or individual, as contemplated by N.J.S.A. 54:10A-3(d).
Accordingly, the final judgment of the Division of Tax Appeals is affirmed.