## Commonwealth v. 2101 Cooperative, Inc. (No. 1)

*Morris J. Dean,* Deputy Attorney General, and *Anne X. Alpern,* Attorney General, for Commonwealth.

*Manuel Kraus,* for defendant.

KREIDER, J., October 31, 1961.—These three cases come before us on appeal from the refusal of the Pennsylvania Board of Finance and Revenue to strike off an asserted franchise tax liability in the amount of $2,271.45; $2,000 and $1,625 against defendant, 2101 Cooperative, Inc., for the period ended December 31, 1953 and the years ended December 31, 1954 and 1955 respectively.[1] Defendant is a foreign cooperative housing corporation organized January 10, 1953, under an Act of Congress, known as the District of Columbia Cooperative Association Act, approved June 19, 1940 (Public No. 642), Chapter 397, 54 Stat. 480. Defendant is located at 2101 Walnut St., Philadelphia, Pa., where it owns and operates a single parcel of improved real estate consisting of a 299 unit apartment house. It possesses no other real property in Pennsylvania or elsewhere.

In its foreign franchise tax reports for the calendar years 1953, 1954 and 1955, defendant claims total exemption as a "nonprofit corporation". Its claim having been denied in the tax settlement by the Pa. Dept. of Revenue, petitions for resettlement were filed with the board of finance and revenue. This was also refused and these appeals from that action followed.

*I*

Defendant contends that because it was organized under the District of Columbia Cooperative Association Act *it is a "nonprofit corporation"* as that term is used in the Pennsylvania law relating to the exemp-

---

[1] The Franchise Tax for these years was computed by applying the tax rate of five mills to a capital stock valuation of $490,580 (1953); $400,000 (1954); $300,000 (1955), plus a $125 penalty.

tion provisions contained in the Foreign Franchise Tax Act. Section 21 of the Act of June 1, 1889, P. L. 420, as reenacted May 16, 1935, P. L. 184 and amended, 72 PS §1871(b), provides in pertinent part:

"(b) Every foreign corporation, joint-stock association, limited partnership, and company whatsoever, from which a report is required under the *twentieth* section hereof, shall be subject to and pay into the treasury of the Commonwealth annually, through the Department of Revenue, *a franchise tax* at the rate of five mills upon a taxable value to be determined in the following manner. The actual value of its whole capital stock of all kinds, including common, special, and preferred, shall be ascertained in the manner prescribed in the twentieth section of this act, and shall then be divided into three equal parts." [2]

Section 20 (72 PS §1901) to which the above underlined phrase refers, is as follows:

"Hereafter, *except* in the case of corporations of the first class, *nonprofit* corporations, and cooperative agricultural associations not having capital stock and not conducted for profit, . . . and foreign insurance companies, it shall be the duty of *every corporation having capital stock*, every joint-stock association, limited partnership, and every company whatsoever, now or hereafter organized or incorporated by or under any laws of this Commonwealth, and of every corporation, joint-stock association, limited partnership, and company whatsoever, now or hereafter incorporated or organized by or under the law of any other State or Territory of the United States, or by the United States, or by any foreign government, and *doing business in* and *liable to taxation within this Commonwealth, or having capital or property employed or used in this Commonwealth* by or in the

---

[2] Italics throughout ours unless otherwise noted.

name of any limited partnership or joint-stock association, company, or corporation whatsoever, association or associations, copartnership or copartnerships, person or persons, or in any other manner, to make annually on or before the fifteenth day of March, for the calendar year next preceding, a (tax) report in writing to the Department of Revenue on a form or forms to be prescribed and furnished by it, setting forth, in addition to any other information required by the Department of Revenue: . . ."

The problem raised by defendant's contention is whether a corporation which is "cooperative" in nature is by that fact alone incapable of qualifying as a nonprofit corporation under the Pennsylvania Nonprofit Corporation Law, Act of May 5, 1933, P. L. 289, as amended, 15 PS §2851-1 et seq. The Commonwealth contends that the very name of defendant, 2101 Cooperative, Inc., indicates its inability to qualify to do business in Pennsylvania as a "nonprofit" corporation under the Nonprofit Corporation Law. It cites section 4 of that act (15 PS §2851-4) which provides in pertinent part:

"This act does not relate to, does not affect, and does not apply to—

"(1) Cooperative associations, whether for profit or not for profit. . . ."

And section 202, 15 PS §2851-202, dealing with the names to be used by domestic nonprofit corporations provides:

"A. . . . The corporate name shall not . . . contain the word . . . 'cooperative', . . ."

Moreover, the Commonwealth asserts that the Pennsylvania Nonprofit Corporation Act makes it clear that a cooperative corporation is no less objectionable when it is a foreign one, as in this case. Section 902 (15 PS §2851-902) provides in pertinent part:

"The Department of State shall not issue a certificate of an authority to any foreign nonprofit corporation:

"(1) If the application for the certificate of authority, hereinafter required by this article to be filed, sets forth any kind of business for which a domestic nonprofit corporation could not be formed under the laws of the Commonwealth. . . .

"(3) If the name of the corporation contains words not permitted by this act to be part of the name of a domestic nonprofit corporation. . . ."

Defendant, on the other hand, contends that it must be considered as a nonprofit corporation because the District of Columbia Act provides that an "association means a group enterprise legally incorporated under this Act, and *shall be deemed to be a nonprofit corporation*", section 1, definitions (1) supra, and for the further reason that the word "nonprofit" in the Pennsylvania Franchise Tax exemption (§20, 72 PS §1901) can mean only one thing, viz., *any* corporation organized for purposes other than pecuniary profit.

Despite the designation of a cooperative association as "a nonprofit corporation" in the District of Columbia Act, we are of the opinion that the nonprofit corporations which are granted an exemption by the Pennsylvania Foreign Franchise Tax Act are only those nonprofit corporations recognized as such by the law of this Commonwealth. We think defendant, 2101 Cooperative, Inc. is not "a nonprofit corporation", as that term is used in the Pennsylvania statute and the courts of this Commonwealth, because, inter alia, pecuniary benefits in the form of reduced rentals, patronage refunds which reflect rents received from commercial leases and other material benefits accrue to defendant and its shareholders. The determination of whether an entity comes within a statutory exemption from taxation in Pennsylvania should depend

upon the status of such entity under Pennsylvania law. When a term has a well-settled meaning within the law of a jurisdiction, it is presumed that the legislature intended to convey such meaning when using the word in a statute. See Ryder Appeal, 365 Pa. 149 (1950) ; Commonwealth v. Hicks, 365 Pa. 153 (1950) ; Smrekar v. Jones & Laughlin Steel Corp., 137 Pa. Superior Ct. 183 (1939).

We think, moreover, that if the legislature of Pennsylvania had desired to exempt foreign cooperative corporations from its foreign franchise tax it would have said so in clear and explicit language. *The inclusion* in the franchise tax provision of the specific exemption for "nonprofit agriculture cooperatives without stock" *leaving all other types of cooperatives unmentioned,* provides a basis, apart from the nonprofit corporation statute itself, for concluding that the term "nonprofit corporation" does not include cooperatives. It is a well settled principle of statutory construction that the mention of one thing in a law implies the exclusion of the thing not mentioned. This principle has found expression in the well-known maxim: "Expressio unius est exclusio alterius." Commonwealth ex rel. Maurer v. Witkin, 344 Pa. 191, 25 A. 2d 317 (1942).

Furthermore, in the "Report on Cooperatives" made to the General Assembly of Pennsylvania in March 1947 by the Joint State Government Commission, a legislative committee consisting of members of the Senate and House, it is stated at page 67:

"As a general rule it may be said that *all incorporated cooperative associations,* other than those specifically incorporated and subject to or free from taxation under special provisions of law, come within the provisions of the Corporate Net Income Tax Act and the Capital Stock Tax Act."

Such reports have been held by the court to be a legitimate aid in construing a statute "whose meaning is doubtful." [3] The committee's report also provides a description of what had been found to be the Commonwealth's taxing practice with respect to cooperative associations (p. 67):

"Four of the eight special incorporation acts creating cooperatives in Pennsylvania *specifically* provided for *certain exemptions* from State Taxation. Of the early acts, the Act of 1887, June 7, P. L. 365, contains no specific provisions on the subject of tax exemptions. Consequently, these cooperatives are treated like regular business corporations for purposes of State taxation. The Attorney General has ruled as follows concerning these cooperatives:

" 'Cooperative associations, productive and distributive, incorporated under the Act of June 7, 1887, P. L. 365, Section 1, 14 P. S. Section 1 et seq., or availing themselves of the provision of the said act, *have capital stock* and clearly fall within the meaning of the word "corporation" as defined by the Corporate Net Income Tax Act, supra. *Hence, these associations are liable for the payment of the said tax.* Those associations, unlike cooperative agricultural associations incorporated under the Act of April 30, 1929, *are not expressly exempted* by their incorporation act from capital stock taxes, hence, they come within the Capital Stock Tax Act, supra, but correspondingly are not subject to the complementary Net Earnings Tax Act, supra.' "

We conclude that various types of agricultural cooperatives constitute the only class of cooperatives exempted from the Capital Stock and Foreign Fran-

---

[3] Bank of Pennsylvania v. Commonwealth, 19 Pa. 144, 156 (1833); Martin Estate, 365 Pa. 280, 74 A. 2d 120 (1950); Scarborough v. Pennsylvania Railroad Company, 154 Pa. Superior Ct. 129, 35 A. 2d 603 (1944); Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §551(8).

chise Tax Acts of this Commonwealth and that a housing cooperative corporation, such as defendant is, has not been exempted by this Commonwealth from taxation under the Franchise Tax Act.

## II

Defendant also contends that it is not a foreign corporation "doing business" within the meaning of the Pennsylvania Business Corporation Law and, accordingly, is not required to pay the tax in question or to obtain a certificate of authority required by section 1001 et seq. of that law, Act of May 5, 1933, as amended, 15 PS §2852-1001. Defendant argues that its purpose is *not* "to do business", nor to employ capital in Pennsylvania for production of income, that the purposes of 2101 Coöperative, Inc., as set out in its articles of incorporation, are to "provide housing for rent or sale . . . all on a nonprofit basis"; that it is not the intention of its members to invest in a profit-making venture but each member's sole purpose is to make one of the apartments his home; that the purposes for which defendant was formed envisioned performance of services for the member patrons, which in its narrow scope is not within the taxable area of "doing business for gain or profit".

Defendant's articles of incorporation were executed on January 6, 1953. Article VIII provides:

"The amount of authorized capital of the corporation shall be $400,100 consisting of 80,000 shares of common stock of a par value of $5.00 per share, and 100 shares of preferred stock of a par value of $1.00 per share, which shares of capital stock shall have the preferences and restrictions as hereinafter provided. . . ."

On July 20, 1953, article VIII was amended to read as follows:

"The amount of authorized capital of the corporation shall be $600,100 consisting of 120,000 shares of

common stock of a par value of $5.00 per share, and 100 shares of preferred stock of a par value of $1.00 per share, which shares of capital stock shall have the preferences and restrictions as hereinafter provided. . . ."

And article IX was likewise amended to read:

"The minimum number or value of shares which must be owned in order to qualify for membership is 50 shares of common stock of an aggregate par value of $250.00."

We think the evidence discloses that defendant is "doing business" in Pennsylvania. In Corporate Taxation and Procedure in Pennsylvania, by Stradley and Krekstein (1952), it is stated (p. 199):

"When a foreign corporation operates an establishment in the state in the full exercise of its charter powers, there is no problem; *that corporation is doing business within the intention of the taxing statutes. . . .*

"It is clear that activity such as the following is sufficient to constitute doing business in Pennsylvania: . . . ownership and operation of income-producing real estate, . . ."

In the instant case, defendant is operating a 299 unit apartment house and four business establishments therein in the full exercise of its charter powers. It owns no other real estate in Pennsylvania or elsewhere. Its sole activities are conducted in this Commonwealth and it certainly is operating "income-producing real estate."

In Commonwealth v. Budd Realty Corporation, 54 Dauph. 387 (Pa. 1943), the taxpayer was incorporated to own, lease and sell real estate. In the year in question, its activities consisted principally of holding and leasing of real estate except for one parcel which was sold and of the payment of interest on its outstanding bonds, of dividends on its stock and of expenses in connection with its minor management functions. This

court, speaking through Judge Rupp, held that these activities constituted the doing of business so as to subject the taxpayer to the Pennsylvania Corporate Net Income Tax.

The principle of the Budd case applies with equal force to the franchise tax here in question.[4] Considering defendant's obvious exercise of its corporate powers, therefore, this housing coöperative corporation fully meets the Budd standard for the "doing of business" and taxability. See also Commonwealth v. American Gas Co., 54 Dauph. (Pa.) 115, 131, 153 (1943), affirmed 352 Pa. 113, 42 A. 2d 161.

### III

The tenant-members are beneficiaries of many profitable advantages that inure to their benefit. Their monthly payments include a proportionate contribution toward

(a) real estate taxes and mortgage interest, deductible for Federal income tax purposes;

(b) the replacement reserve of $1,090 a month;

(c) the general operating reserve of 3 percent of the total monthly expenses to be charged to the members;

(d) they also receive the right to park their cars in defendant's garage in central Philadelphia for $14 per month.

(e) defendant coöperative and its shareholders participated in the receipts from the rents received from three commercial tenants, one of whom paid rent on a gross receipts percentage basis.

Moreover, the tenant members in the instant case receive additional benefits which, in general, are of the type described by Judge Lewis of the Superior Court of

---

[4] Stradley and Krekstein, Corporate Taxation and Procedure in Pennsylvania, §211 (1952).

New Jersey in Pine Grove Manor, v. Director, Division of Taxation, 68 N. J. Super. 135, 151, 171 A. 2d 676, 685 (1961):

". . . In case a member desires to sell his certificate and the corporation does not exercise its 30-day option right to repurchase, there is no limitation on the purchase price; (5) upon liquidation or dissolution of the corporation, they would participate proportionately in the final distribution of the net assets of the corporation, which conceivably could be substantial, particularly if a profitable sale be made after a full or sizeable reduction of the mortgage encumbrance; (6) the F.H.A. mortgage is subject to prepayment, whereupon the governmental controls and restrictions terminate; (7) equity distributions may be made to the certificate holders in case of the total destruction of the apartment buildings by fire; (8) they have an interest in the residual receipts from vending machines, washing and drying machines, non-dwelling facilities, etc., and the surplus funds which, after reserves and obligations, are distributable to members, 'in the form of reduced carrying charges or reduced sales prices of the dwelling accommodations, or patronage refunds.' See 24 C.F.R., sec. 241.25.

"These enumerated acquirements are real and potential and should not be considered as being indefinite or intangible; they result from the commercial activities of a nonstock cooperative housing corporation operated for the financial and social betterment of its members. These are profitable benefits, current and progressive. It is of real significance that upon corporate liquidation the certificate holders, who are the capital investors, participate in the distribution of net corporate assets. The contention of plaintiffs that they are corporations 'not conducted for pecuniary profit of any private shareholder or individual' is inconsistent with the foregoing facts."

The articles of incorporation of 2101 Cooperative, Inc. provide, article I (d):

"The purposes of this corporation shall be to: . . .

"(d) Apply for and obtain or cause to be obtained from the Federal Housing Commissioner, hereinafter called the 'Commissioner', *a contract* or contracts of *mortgage insurance* pursuant to the provisions of Section 213 of Title II of the National Housing Act, as amended, covering bonds, notes and other evidences of indebtedness issued by this corporation and any indenture of Mortgage or Deed of Trust securing the same. *So long as any property of this corporation is encumbered by a Mortgage* or Deed of Trust insured by the Federal Housing Commissioner *it shall engage in no business other than as herein provided.*"

It will be noted that here there is a statement qualifying the purported nonprofit feature of this cooperative. It could be contended that its business is limited to housing for rent or sale on a mutual ownership basis and only "so long as" the F.H.A. insurance continues.

Furthermore, the articles of incorporation provide in article XI (b) with respect to dissolution, as follows:

"(b) In case of any liquidation, dissolution, or winding up of the affairs of the corporation, whether voluntary or involuntary, and after payment of all debts of the corporation (including payment in full of any mortgage insured by the Commissioner) and after redemption of the preferred stock as above and redemption of the common stock at its par value, *any surplus shall be distributed among those patrons* who have been members or subscribers at any time during the past six years on the basis of their patronage during that period."

The preferred stock consisting of 100 shares of a par value of $1 per share is held by the F.H.A. under the provisions of article VIII; so that after a total redemption payment of $100, the entire assets of this coopera-

tive corporation, when liquidated, would be available for distribution to "those patrons who have been members or subscribers at any time during the past six years on the basis of their patronage during that period."

Defendant vigorously contends that it is a nonprofit cooperative corporation and that its members have not organized to make any pecuniary profits for themselves. In Celina and Mercer County Telephone Co. v. Union-Center Mut. Telephone Assn., 102 Ohio 487, 494, 133 N.E. 540, 542, 21 A.L.R. 1145 (1921), the Supreme Court of Ohio asked and answered the question:

"How may it be determined whether a corporation or association is one for profit or not for profit? Does the filing of articles of incorporation, in which the declaration is made that it is not for profit, and on which the charter is issued, govern or determine this question? Is the issuance or nonissuance of capital stock controlling, or is it whether a business is to be engaged in, and operated with consideration of the character of that business, and the method of conducting it, that is the true test? We think the latter."

This case was cited with approval in a later decision by the Ohio Supreme Court in State ex rel. Russell v. Sweeney, 153 Ohio 66, 91 N.E. 2d 13, 16, 16 A.L.R. 2d 1337 (1950). There, despite the statements in the purpose clause of the articles of incorporation asserting that the cooperative corporation was formed:

"To promote the social welfare of the community . . . and to secure the benefits of home ownership to the present inhabitants of the area . . .

"Each person becoming a member of this corporation agrees thereby, as a condition of membership, that any surplus receipts of the corporation which might otherwise in any way inure to his benefit as pecuniary

gain or profit, may not be accepted or received by him as such member . . ."

the court refused to accept these self-designating statements as conclusive as to the character of the corporation and quoted from the opinion of the Supreme Court of Washington in State ex rel. Troy v. Lumbermen's Clinic, 186 Wash. 384, 394, 58 P. 2d 812, 816 (1936) :

"Profit does not necessarily mean a direct return by way of dividends, interest, capital account or salaries. A saving of expense which would otherwise necessarily be incurred is also a profit to the person benefited. If respondent renders to its incorporators or members, or to businesses in which they are interested and in whose profits they share, a service at a cost lower than that which would otherwise be paid for such service, then respondent's operations result in a profit to its members."

In Harry Alan Gregg, Jr., Family Foundation, Inc. v. Commissioner of Corporations and Taxation, 330 Mass. 538, 543, 116 N.E. 2d 146, 150, the Supreme Court of Massachusetts held that:

"Subterfuges and devices whereby a corporation allows its profits to be diverted to those owning it, though not in the form of dividends, would, of course, disqualify it from being classed as a nonprofit corporation."

In State ex rel. Attorney General v. The Home Cooperative Union, 63 Ohio 547, 59 N.E. 220, it was held that the organization of coöperative companies for the purpose of dealing in real estate was necessarily for profit. Compare American Medical Association v. United States, 317 U. S. 519 (1942) wherein it is stated (p. 528) :

"Group Health is a membership corporation engaged in business or trade. Its corporate activity is the consummation of the coöperative effort of its members to obtain for themselves and their families medical serv-

ice and hospitalization on a risk-sharing prepayment basis. The corporation collects its funds from members. With these funds physicians are employed and hospitalization procured on behalf of members and their dependents. The fact that it is coöperative, and procures service and facilities on behalf of its members only, does not remove its activities from the sphere of business."

In considering defendant's claim that it is *totally* exempt from the Pennsylvania Foreign Franchise Tax because it is a "nonprofit corporation", certain fundamental principles must be kept in mind:

First: All property is liable to taxation for the purpose of raising revenue for governmental purposes except such property as is exempted therefrom by statutory enactment within the constitutional limitations: Commonwealth v. Perkins, 41 D. & C. 55, 342 Pa. 529, 531 (1941), affirmed 314 U. S. 586, 86 L. Ed. 473.

Second: Tax exemption statutes must be strictly construed: McGuire v. Pittsburgh School Dist., 359 Pa. 602 (1948); City of Harrisburg v. Cemetery Assn., 293 Pa. 390 (1928); Harrisburg v. Trustees of Harrisburg Academy, 308 Pa. 585 (1932); Pennsylvania Bar Association Endowment v. Robins, 10 D. & C. 2d 637, 68 Dauph. 338 (1955).

Third: The right to exemption from taxation must be clearly and indubitably established: Ogontz School Tax Exemption Case (Appeal of Twp. of Abington), 361 Pa. 284 (1949); Wynnefield United Presbyterian Church v. City of Philadelphia, 348 Pa. 252 (1944).

In the Law of Cooperatives by Packel (3rd Ed. 1956), §62(b), page 285, the author states:

"Franchise taxes frequently spell out a specific exemption for nonprofit corporations. The cases are not clear on this specific issue, but *the weight of authority*

would seem to support the view that the *ordinary co-operative is not within the meaning of such an exemption.*" [5]

In Storen v. Jasper County Farm Bur. Coop. Assn., 103 Ind. App. 77, 2 N. E. 2d 432 (1936), the Appellate Court of Indiana pointed out that:

. . . "It is not what an organization is deemed to be but what it actually is that controls.

"Of course it might be altogether possible to organize under the agricultural marketing act so as to come within the exemption but the question here is whether or not the organization as operated comes within the exemption, and since this must receive a strict construction *the fact alone* that *a part of the income* inures to the benefit *of private individuals not members of the association* is sufficient in and of itself to prevent the exemption from extending to the appellee."

In the instant case, it should be noted that upon dissolution the net remaining assets of defendant, 2101 Cooperative, Inc., are to be distributed among all patrons, whether members or not, who have been patrons for the past six years and such distribution is to be made according to their patronage. This would hardly seem to be in line with the professed spirit of the organizers of this cooperative as announced in the purpose clause of the articles of incorporation.

## IV

Defendant's final contention is that the certificates of ownership which it sells to its members are an interest in realty and not capital stock subject to tax within

---

[5] Citing State ex rel. Dawson v. Sessions, 95 Kan. 272, 147 Pac. 789 (1915); Storen v. Jasper County Farm Bur. Coop. Assn., 103 Ind. App. 77, 2 N. E. 2d 432 (1936); Farmers Oil Co. v. State Tax Com., 41 N. M. 693, 73 P. 2d 16 (1937); cf. Boston Chamber of Com. v. Assessors, 315 Mass. 712, 54 N. E. 2d 199 (1944).

the meaning of the Pennsylvania Franchise Tax Act. We do not agree. Defendant has stipulated (stipulation no. 5) that "the ownership interest (in the cooperative) is represented by stock in the corporation." Defendant asserts that since it is not the member's intention to invest in a profit-making venture, but each member's sole purpose is to make one of the apartments his home, the certificates of ownership must be considered as "mere evidence of interests in real estate." Defendant relies on Justus v. Bowers, Tax Commissioner, 167 Ohio 384, 148 N. E. 2d 917 (1958), wherein the Supreme Court of Ohio held that where each of a cooperative corporation's four shareholders occupied an apartment as a permanent living quarters and no dividends were paid, the four blocks of stock were "merely evidences of the owners' interests in the realty," that the shareholders' investments were investments in real property and not taxable items of intangible nersonal property. While concurring in the judgment that the shares of the cooperative had no more that a nominal value and were therefore not taxable, three judges dissented from the conclusion stated in the per curiam opinion that the blocks of stock were merely evidences of the owners' interest in the realty. Judge Taft in expressing the minority view on this point said:

"Shares of stock in this corporation are not 'merely evidences of the owners' interests in the realty.' They are 'shares of stock' in a corporation and clearly described by the words of Section 5701.06, Revised Code. After the sale by this corporation of all its shares, the shareholders, not as shareholders but as holders of leases from the corporation, will have leasehold interests in the $160,000 of real estate for 50 years rent free. However, the corporation will still own the reversions after the 50-year terms of those leases. The value of those reversions will obviously increase with

the passing of the years as the terms of those leases diminish; and *there is no way that any shareholder can assert any ownership with respect to such reversionary interests of the corporation in such real estate except as a shareholder* of and through the corporation. Certainly, no shareholder can ask for a partition of this real estate before securing a transfer from the corporation of its reversionary interests therein. *It is apparent therefore that a shareholder of this corporation as such has no interest in real estate.* He has an interest in real estate only by reason of his lease from the corporation.

"State v. Silberberg, 166 Ohio St. 101, 139 N. E. 2d 342, 346, involved a question whether what was there purchased was described by the term 'security' as defined in another statute which specifically said that its 'provisions . . . shall not apply . . . to the sale of real estate.' [R. C. §1707.01]. *Under the contract there purchased, a buyer was entitled to a deed for his fractional part of the real estate* upon payment of the purchase price so that that contract did in effect represent a contract for the sale of real estate, and the act was therefore by its words not applicable.

"Under its agreement for the sale of a block of shares of its stock, this corporation also executes and delivers to the purchaser a 50-year lease of the apartment that he, as a holder of his block of shares, is to be entitled to occupy. This lease does not provide for the payment of any rental. Hence, it is apparent that the purchaser of a block of say 25 shares for $25,000 acquires at least two items of property, i.e., 25 shares of stock and a leasehold interest entitling him to occupy rent free for 50 years 25/160 of $160,000 worth of real estate; and that any, if not all, of the 'true value in money' of what he owns by reason of his purchase will, at least at a time when all the leasehold interests

have almost 50 years to run, be in his leasehold interest rather than in his shares of stock. In view of the provision of paragraph (C) of Section 5701.06, Revised Code, quoted above, it is apparent that such a leasehold interest is not described by the term 'investments' as defined by that statute.

"There is nothing in this record which will justify a reasonable finding that the shares of this corporation had more than a nominal value. Hence, *and for that reason only*, the decision of the Board of Tax Appeals should be affirmed."

We believe that the opinion of Judge Taft is sound and should be adopted in the instant case. Moreover, it should be noted that a recent ruling of the Internal Revenue Service rejects the proposition advanced by appellant in this case that the stock certificates held by housing cooperative members may be disregarded for tax purposes because the members' real ownership interest lies in the underlying leasehold.

In Rev. Ruling 61-162; I.R.B. 1961-37, 9; 617 CCH Standard Federal Tax Reports §6521 (1961, Vol. 7), a similar position had been taken by a member of a housing cooperative for the purpose of allocating his original investment, not to the stock, but to the leasehold in order to obtain the tax advantage of depreciation deductions. This argument by the taxpayer was summarized in the ruling, as follows:

" . . . The taxpayer contended, however, that he was the owner of a leasehold on an apartment and that he was entitled to depreciate or amortize a portion of his investment in the corporation, while his apartment was subleased, as an amount paid for a leasehold."

The Internal Revenue Service rejected this argument, saying:

"When the taxpayer paid money to the corporation in return for stock of the corporation, he established

a basis in the stock for tax purposes. He was entitled to the occupancy or use of the apartment as a dwelling solely by virtue of the fact that he owned the stock, and upon disposing of the stock his rights would terminate. Since the right to occupy an apartment was conditioned upon continued ownership of the stock, it was inseverable therefrom, and the taxpayer established no tax basis in his rights with respect to the apartment as distinguished from the stock.

"For tax purposes, the taxpayer is in the same position as any other owner of stock in a corporation except insofar as he is able to qualify for the deduction provided by section 216 of the Code with respect to real estate taxes and interest paid or incurred by the corporation during the taxable year. The fact that the taxpayer chose to sublease his apartment rather than occupy it himself does not change the nature of the property in which he invested.

"Accordingly, it is held that the entire cost of stock in a corporation, qualifying as a cooperative housing corporation under Section 216 (b) of the Code, represents an investment in such stock only, and no part of the investment may be allocated to the tenant-stockholder's right to occupy a dwelling unit which was acquired with such stock."

For other cases which considered the members of a cooperative corporation not as owners but as lessees having rights against and obligations toward the corporation which is the owner, see Yourman, "Some Legal Aspects of Cooperative Housing," Vol. 12, Law and Contemporary Problems (1947), p. 139; Prudence Co. v. 160 W. 73rd St. Corp., 260 N. Y. 205, 183 N. E. 365, 86 A.L.R. 361 (1932) ; Shaffer v. 8100 Jefferson Ave. East Corp., 267 Mich. 437, 255 N. W. 324 (1934) ; In re 325 East 72nd St., Inc., 173 Misc. 347, 18 N. Y. S. 2d 59 (1940). Contra: In re Pitts' Estate, 218 Cal.

184, 22 P. 2d 694 (1933), cited in Co-operative Apartment Housing, 61 Harvard Law Rev. 1425, 1426 (1948).

In the instant case, the owners of the stock are not entitled to and do not receive a deed for their fractional part of the real estate they occupy. They cannot sell their interest without the consent of the board of directors, nor can they mortgage or otherwise encumber their individual shares. We conclude that the certificates of ownership issued by 2101 Cooperative, Inc., are in fact capital stock as stated on their face and not nontaxable interests in real estate.

For the foregoing reasons, the appeals of defendant, 2101 Coöperative, Inc., in nos. 423, 425 and 427 Commonwealth docket 1958, should be dismissed. The parties have stipulated [6] the amount of the judgment to be entered in favor of the Commonwealth if the latter's position should be sustained. Accordingly, we enter the following

### Order

And now, October 31, 1961, it is ordered and decreed that the Pennsylvania Foreign Franchise Tax of defendant, 2101 Coöperative, Inc, for the period ended December 31, 1954; and the years ended 1955 and 1956, be resettled at $2,271.45, $2,000 and $1,625 respectively, and judgment entered in favor of the Commonwealth and against defendant in said amounts. Costs shall be paid by defendant.

---

[6] Stipulation of Facts, Para. 22.

"Under the Commonwealth's theory of the case, defendant's Foreign Franchise Tax for the period ended December 31, 1954, and the years ended 1955 and 1956, should be resettled at $2,271.45, $2,000.00 and $1,625.00 respectively, and judgment entered in favor of the Commonwealth and against defendant in said amounts.

"Under defendant's theory of the case the said taxes should be resettled at none."

426

The prothonotary is directed to notify the parties or their counsel of this order.