**1050 TENANTS CORP. et al.,**
**Plaintiffs,**

v.

**Peter JAKOBSON et al., Defendants.**

**No. 72 Civ. 2261.**

United States District Court,
S. D. New York.

Oct. 11, 1973.

———◆———

Pollack & Singer, New York City, for plaintiffs; Martin I. Kaminsky, Richard M. Asche, New York City, of counsel.

Rosenman, Colin, Kaye, Petschek, Freund & Emil, New York City, for de-

fendants; Asa D. Sokolow, Peter F. Nadel, New York City, of counsel.

## OPINION

STEWART, District Judge:

This action is brought by 1050 Tenants Corporation ("the Corporation") a cooperative housing corporation, and Herbert and Joan Saltzman, purchasers and holders of shares in the Corporation, as representatives of a class consisting of all past and present shareholders. The complaint alleges that the defendants, sponsors and promoters of the cooperative plan pursuant to which the Corporation was organized and shares offered and sold, violated provisions of federal [1] and state [2] securities laws and regulations by making false and misleading statements and omissions in connection with and in the course of issuance of the shares.

Defendants deny the substantive allegations of the complaint and also move to dismiss it under Rule 12(b)(1) and (6), Federal Rules of Civil Procedure, on the grounds that plaintiffs fail to state a claim upon which relief can be granted, and that therefore this Court lacks subject matter jurisdiction. Defendants argue that shares in a cooperative housing corporation are not "securities" within the definition contained in the federal securities laws and regulations, and that therefore plaintiffs state no federal cause of action in Counts One, Two or Three. Dismissal of these counts would of course require dismissal of Counts Four and Five, the pendent state claims.

Thus, the dispositive question on the motion to dismiss presently before this Court is: are the shares of the plaintiff Corporation "securities" under the federal securities laws? If so, plaintiffs have stated valid federal causes of ac-

1. Count one: Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 (17 C.F.R. § 240.10b–5); Count two: Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); Count three: Section 12(2) of the Securities Act

of 1933, 15 U.S.C. § 77l(2). ("the federal counts" or "federal causes of action").

2. Count four: Section 352–c of the New York General Business Law Count five: common law fraud. ("the pendent state claims").

tion; if not, plaintiffs' complaint must be dismissed.

This Court denies defendants' motion to dismiss. We find that the shares of stock in plaintiff Corporation are "securities" within the definition of the federal securities laws, and that those laws govern the transactions involved in this action.

### Facts

The plaintiff Corporation was formed by the defendants pursuant to New York Business Corporation Law § 402, In May, 1968, defendants made a public offering of the corporate stock by formal prospectus, or "Plan", as is required by state law of all offerings of "securities constituted of participation interests or investments in real estate . . ."[3] Ownership of shares of stock entitled purchasers to proprietary leases in apartments at 1050 Park Avenue.

As provided in the Plan, the Corporation had an authorized capital of 45,000 shares at $1.00 par value per share. 42,400 shares were allotted to the approximately 60 residential apartments offered under the Plan, according to the contemplated selling price of each apartment. (Plan pp. 3, 10)[4] It was contemplated that the apartments not offered for residential use would be rented out by the Corporation as doctors' offices, the income therefrom to be income to the Corporation. (Plan p. 3) Such income would be used to offset and reduce the periodic assessments on shareholders for maintenance of the building.

The Plan required each shareholder to execute and conform to a uniform proprietary lease. The lease contained prohibitions on subletting or assigning without the consent of the Corporation, as well as restrictions on partial trans-

fer of shares or separate ownership of the lease and shares. (Plan pp. 11–12)

On the Closing Date, according to the Plan, the defendants were required to turn over title to the apartments sold to the Corporation, and stock certificates to the shareholders. (Plan pp. 24–25) The Plan authorized the defendants to retain control of the shares and leases in apartments not sold by the Closing Date. In fact, by the closing on January 30, 1969, all of the apartments had been sold, and title to the property was conveyed to the Corporation by the defendants, who received payment from the proceeds of the sale of shares and leases.

At the closing, the Corporation also assumed pursuant to the Plan several obligations made by the defendants: a three-year agreement making Pease & Elliman, Inc., defendants' sales agent, the Managing Agent of the building, at a fee of $9,000 per year (Plan p. 25); at least eight other service management contracts, including one with an electrical service company for certain electrical installations in the building at a cost of $17,065 (Plan pp. 5–6, Schedule I); and two mortgages (Plan pp. 20–23).

The shareholders-lessees were to, and did, meet to elect a Board of Directors to manage the Corporation's affairs. In such elections, as is usual in corporate decisions in which the shareholders have a voice, each share was entitled to one vote.

### Legal Principles

The definitions of "securities" under the 1933 Securities Act[5] and the 1934 Securities Exchange Act[6] are almost identical, and the Supreme Court has found them to be interchangeable in this situation.[7]

---

3. New York General Business Law § 352–e (McKinney 1968).

4. Citations in this form are to the Amended Plan of Cooperative Organization, Defendant Emil's Affidavit, Exhibit C.

5. Securities Act of 1933, § 2(1), 15 U.S.C. § 77b(1).

6. Securities Exchange Act of 1934, § 3(a)(10), 15 U.S.C. § 78c(a)(10)

7. Tcherepnin v. Knight, 389 U.S. 332, 88 S. Ct. 548, 19 L.Ed.2d 564 (1967); S.Rep. 792, 73d Cong., 2d Sess. 14 (1934).

§ 3(a)(10) of the 1934 Act provides:

3. (a) When used in this chapter, unless the context otherwise requires —(10) The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.[8]

Plaintiffs assert that the corporate scheme in this action should be treated like any other under the federal securities laws. They put forth two theories under which the shares in the Corporation may fall within the above definition. First, they urge that "any . . . stock" means, literally, any stock; and that the use of stock certificates, actually sold and delivered, within a traditional corporate format is dispositive. Second, and alternatively, they urge that the shares in the Corporation be deemed an "investment contract" under the statutory definition, since the traditional three-prong test for an investment contract established by the Supreme Court in Securities and Exchange Commission v. Howey Co.[9] is satisfied.

Defendants counter that the courts have always looked to the content and economic realities and not the form to characterize a transaction, and that the mere fact that stock certificates are used as a "mechanical vehicle" to allow the purchasers to own their residences and gain tax benefits is not determinative. They argue that the purchasers intended to buy homes, not investments, and that therefore this is not the commercial type of transaction intended to be covered by the securities laws. As to the "investment contract" theory, defendants dispute that the Corporation's shares meet the *Howey* test.

This is essentially a question of first impression. Judge Pierce, of this District, has recently decided, in a scholarly and comprehensive opinion, that shares in a state-financed and supervised, non-profit cooperative housing corporation were not "securities" under the federal laws.[10] We point out, however, that the elements of state control and non-profit make that case materially different from the one at bar, as Judge Pierce himself recognized. The parties have not cited, and we have not uncovered, any other federal court decision on this point.

We find that the definitions of "securities" in the 1933 and 1934 Acts and their judicial interpretations, are sufficiently broad so as to include the shares of plaintiff Coporation, under either theory propounded by plaintiffs. We express no view on the merits of plaintiffs' allegations.

I

The interpretation of the term "any . . . stock" in § 3(a)(10) is considered first.

The Supreme Court has given some indication that the issuance of stock cer-

---

8. 15 U.S.C. § 78c(a)(10).

9. 328 U.S. 293, 298–299, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The arrangement must be: 1) a common enterprise; 2) where the investor has an expectation of profits; and

3) from the efforts of the promoter or a third party. *Infra* at pp. 1175–1176.

10. Forman v. Community Services, Inc., 366 F.Supp. 1117 (S.D.N.Y. September 6, 1973) (hereinafter *Forman*).

tificates within a traditional corporate structure may be dispositive. In Securities and Exchange Commission v. Joiner,[11] the Court, finding that the oil leases at issue fell within the securities laws, said,

> In the Securities Act the term "security" was defined to include by name or description many documents in which there is a common trading for speculation or investment. Some, such as notes, bonds, *and stocks*, are pretty much standardized and the name alone carries a well settled meaning. Others are of more variable character and were necessarily designated by more descriptive terms, such as "transferable share," "investment contract," and "in general any interest or instrument commonly known as a security" . . . . Instruments may be included within any of these definitions, as matter of law, if on their face they answer to the name or description. (emphasis added)[12]

It was apparently these words that Judge Mansfield was heeding when he decided Movielab, Inc. v. Berkey Photo, Inc.[13] Although that case dealt with the provision including "any note" within the definition of "securities", there is no reason to conclude that Judge Mansfield's words do not apply equally to the "any . . . stock" provision:

> There is no ambiguity in the language [of the statute]. Nor does a literal reading of the language defeat or hamper Congress' apparent purpose. We cannot therefore say that Congress did not intend to legislate with respect to fraud in the issuance or promissory notes of the type here involved.

Try as we may, we fail to detect in the 1934 Act any grant of discretionary power to the court to construe the term "security" as including certain types of notes but not others. Congress apparently decided that it would pass a sweeping prohibition rather than attempt to draw distinctions. We are bound by that decision.[14]

The legislative history is sparse, and somewhat circular. To the extent it can be discerned, it is expansive in scope. The definition of "security" is deemed "sufficiently broad and general . . . so as to include . . . the many types of instruments that in our commercial world fall within the ordinary concept of a security".[15]

The position of the Securities and Exchange Commission, were it certain, would weigh on this Court's judgment.[16] Rule 235(a)[17] exempts from registration under certain conditions "[s]tock or other securities representing membership in any cooperative housing corporation". Plaintiff argues that if the Securities and Exchange Commission did not feel that such stock or securities were within federal law generally (including specifically the anti-fraud provisions), there would be no need to exempt certain of them from the registration provisions. In light of the Securities and Exchange Commission's recent statement on "condominium units, or other units in a real estate development"[18] this

---

11. 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943).

12. 320 U.S. at 351, 64 S.Ct. at 123.

13. 321 F.Supp. 806 (S.D.N.Y.1970) aff'd, 452 F.2d 662 (2d Cir. 1971).

14. 321 F.Supp. at 809. *See also* Llanos v. United States, 206 F.2d 852 (9th Cir. 1953) cert. denied, 346 U.S. 923, 74 S.Ct. 310, 98 L.Ed. 417 (1954); Lehigh Valley Trust Co. v. Central Nat'l Bank of Jacksonville, 409 F.2d 989, 991–992 (5th Cir. 1969).

15. H.Rep. 85, 73d Cong., 1st Sess. 11 (1933).

16. Securities and Exchange Commission v. Associated Gas & Elec. Co. 99 F.2d 795, 798 (2d Cir. 1949).

17. 17 C.F.R. § 230.235(a) (1973).

18. S.E.C. Release No. 5347, Jan. 4, 1973, Fed.Sec.L.Rep. ¶ 79, 163 (Trans. Binder 1973).
The S.E.C. suggests that shares in such units *may* be considered securities if certain conditions are met; for example, where benefits are accrued from efforts of a promoter or third party (see II B. *infra*). If reference to "other units in a real estate develop-

Court is not convinced that the Securities and Exchange Commission has a firm position as to cooperative housing corporations. We therefore give the negative implications which can be drawn from Rule 235(a) some, but by no means controlling, weight.

We repeat that plaintiff Corporation is organized under the state Business Corporation Law, and has issued shares of stock, which, including certain transfer restrictions, are no different than shares in other New York business corporations.

Aside from urging this Court to look to the primary purpose of the transaction, (which, they argue, is home ownership), defendants offer no persuasive reason why the phrase "any . . . stock" is, or should be, read restrictively. We do not agree with defendants that the Supreme Court has applied that provision restrictively. Neither Tcherepnin v. Knight, *supra*, nor S.E.C. v. Howey Co., *supra*, speak at all to the "any . . . stock" provision of § 3 (a)(10), but rather construe the term "investment contract". In neither of those cases, nor in any other case cited to us by the defendants, has a federal court, faced with a similar corporate structure, limited the plain language of § 3(a)(10).[19]

Therefore, we find that the consistently liberal and broad interpretation given to the provisions of the federal securities laws,[20] and the absence of restriction, legislative or judicial, on the term "any . . . stock," requires a finding that shares issued in the plaintiff Corporation are "securities" under the federal laws.

## II

Alternatively, we find that the corporate scheme in this case falls under the "investment contract" provision of § 3(a)(10) of the 1934 Act and § 2(1) of the 1933 Act, as interpreted by the Supreme Court in Securities and Exchange Commission v. Howey Co., and later cases.[21]

The *Howey* Court established a three-prong test based on the economic realities of each transaction:

> . . . an investment contract for the purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . [22]

Both parties concede, as they must, that there was a common enterprise involved in the creation of 1050 Tenants Corporation. The latter two prongs of the *Howey* test raise dispute—expectation of profits and reliance on the efforts of the promoter or a third party.

A. Expectation of profits.

Defendants argue that since the primary purpose of the shareholders' purchases was home ownership, rather than investment, there was no expectation of profits.

The *Howey* test looks to the substance of the transaction and of the relationship between the issuer and security holder. We cannot, however, probe deep into the minds of each purchaser to discern whether there was, in fact, expectation of profits from the purchase, and whether that was the primary motive, or

ment" includes cooperatives, this suggestion belies the effort to characterize the S.E.C.'s position as one in which shares in cooperative housing corporations are always, by definition, securities.

19. In Ashton v. Thornley Realty Co., 346 F. Supp. 1294 (S.D.N.Y.1972) aff'd, 471 F.2d 647 (2d Cir. 1973), Judge Lasker found for defendants on the merits in a cooperative housing corporation case without mention of this arguably serious jurisdictional obstacle. In Davenport v. United States, 260 F.2d 591

(9th Cir. 1958), a criminal case, that court also did not discuss the issue, apparently accepting a share in an employment cooperative as a security.

20. *E. g.*, S. E. C. v. Howey Co., *supra*; Tcherepnin v. Knight, *supra*.

21. *E. g.*, Tcherepnin v. Knight, *supra*; S. E. C. v. Variable Annuity Co., 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959).

22. 328 U.S. at 298–299, 66 S.Ct. at 1103.

not. Nor must we accept at face value, as defendants suggest, the statement of purpose contained in the Plan. After examining this transaction, we can say that there are at least three factors which indicate the possibility or likelihood of profit which the shareholders of plaintiff Corporation could have anticipated:

1. Resale of shares at a profit. The shares cannot be transferred without the lease, nor without the consent of the Corporation. (Plan p. 12) However, there are no provisions, as there were in the *Forman* situation,[23] prohibiting transfer of shares at a price higher than the shareholder originally paid, nor any provision giving the Corporation right of first refusal. While transfer of shares is restricted, it is not so encumbered as to preclude the possibility of profit.[24] To contend that the purchasers of plaintiff Corporation stock did not intend to make a profit is to engage in the type of mind-probing speculation we find unhelpful and unnecessary.

2. Tax benefits. One of the attractions of this type of home ownership are the tax benefits which accrue to the shareholders.[25] (Plan pp. 17–18) Defendants argue, however, that these monetary benefits are incidents of home ownership, rather than investment. We fail to see the pertinence of that line of argument. Apartment dwellers in 1050 Park Avenue were regularly making rental payments without being allowed to deduct them from their federal income tax. When defendants convinced these residents to incorporate, one of the reasons given was availability of tax deductions of their monthly maintenance

charges. Such direct monetary benefit, by any other name, is still profit.

3. Income from professional offices. The space available for professional offices presented the likelihood of income to the Corporation. While this income would not result in dividends to the shareholders, but merely a reduction in their monthly maintenance charges, this is merely a difference in degree, or quantity of profits, rather than a difference in kind.

In sum, purchasers had sufficient reason to expect monetary profit from this investment to satisfy the second prong of the *Howey* test.[26]

B. Reliance on others.

The more difficult question is whether or not the expected profits may accrue in this situation solely from the efforts of the promoter or a third party.

We approach this question solely in terms of economic reality, as defendants urge us to do. In *Forman* Judge Pierce found that the "massive size of Co-op City . . . [makes it] specious to argue that the cooperative ideal precludes the notion of management by third parties".[27]

We similarly find that the notion of sponsor involvement and management by third parties is not precluded in this case. We point to the following factors:

1. Defendant sponsors had complete control over initial financial arrangements and the general guidelines under which the Corporation still operates.

2. Although it did not come to pass, the Plan made provision for sponsor representation on the Board of Directors should the sponsors not have been able

---

23. 72 Civ. 3980 (S.D.N.Y.1973) Slip Op. at 7–8.

24. This point was the *ratio decidendi* of *Forman*, and the striking distinction between *Forman* and the case at bar. See also Tcherepnin v. Knight, 389 U.S. at 343, 88 S. Ct. 548, where the Supreme Court found that the fact that the shares were not negotiable was not relevant to the question of whether they were "securities" under § 3(a)(10).

25. Internal Revenue Code § 216, 26 U.S.C. § 216; New York Tax Law § 615 (McKinney's, 1966).

26. Since we so find, we need not go so far as to determine whether expectation of profit may be shown where plaintiffs can merely show risk of capital which is managed by others. Silver Hills Country Club v. Sobieski, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961) (J. Traynor).

27. Slip Op. at 20.

to sell all of the shares, and for sponsor veto over certain decisions if sponsors, or their assignees, retained 25% of the shares. (Plan pp. 10–11) There was also provision for continued sponsor involvement in the selling of shares over a four-year period after closing, if all shares had not been previously sold.

3. The defendant sponsors did obligate the Corporation to at least nine contracts, including one for the management of the building by an agent of the sponsors, which extended for three years past the time the shareholders were supposedly in complete control. (Plan pp. 20, 25, Schedule I)

In its early and crucial stages, both prior to, and for a period of time after closing, this investment was in the effective control of the defendant sponsors. The economic realities of this scheme are accurately reflected by the following observations:

> . . . the development stage—the investigation and selection of a site, the sale of fractional interests to investors, and the reliance on the promoter for information—should be the relevant period when considering who is exercising control. Moreover, even in the management stages, most of the important decisions have been conclusively made by the sponsor before the board of directors begins to function and are not subject to change. Such decisions include the allocation of shares, the financing arrangements, long-term commercial leases, and long-term service contracts. Indeed, the actual management is often provided for by a long-term management contract, again arranged by the sponsor. (citations omitted) [28]

The offer and purchase of shares in plaintiff Corporation meets the third, and final, prong of the *Howey* test as an investment contract.

Either because shares in plaintiff Corporation constitute stock or because they constitute investment contracts un-der the federal securities laws, this Court has subject matter jurisdiction, and plaintiffs have stated a claim upon which relief can be granted. Defendants' motion to dismiss is denied.

It is so ordered.

---

28. Note, Cooperative Housing Corporations and the Federal Securities Laws, 71 Col.L.Rev. 118, 128–129 (1971).