Milton **FORMAN** and Ellen Forman et al.,
Appellants,

v.

**COMMUNITY SERVICES, INC.**, et al.,
Appellees.

No. 747, Docket 73–2613.

United States Court of Appeals,
Second Circuit.

Argued April 4, 1974.

Decided June 12, 1974.

Louis Nizer, New York City (Phillips, Nizer, Benjamin, Krim & Ballon, George Berger, Jay F. Gordon, Richard S.

**1248**

Brooks, Janet P. Kane, New York City, of counsel), for appellants.

Simon H. Rifkind, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, Alan G. Blumberg, Martin London and George P. Felleman, New York City, of counsel), for appellees.

Daniel M. Cohen, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of State of N. Y., Samuel A. Hirshowitz, First Asst. Atty. Gen., of counsel), for appellees State of New York and New York State Housing Finance Agency.

Before HAYS and OAKES, Circuit Judges, and CHRISTENSEN, District Judge.[*]

OAKES, Circuit Judge:

■ This appeal by resident tenants of Co-op City presents the question whether a share of stock in a cooperative apartment nonprofit company chartered and subsidized under the State of New York's Mitchell-Lama Act[1] is a "security" within the meaning of the federal securities laws. All the appellees urge that because there is no promise, expectation or possibility of profit in connection with a member's resale of a cooperative share and because the cooperative housing company is created pursuant to an emergency state program for low cost housing, state financed and supervised, and sponsored by a nonprofit foundation, that cooperative shares in it are not securities. The appellee New York State Housing Finance Agency ("the agency") also claims not to be a "person" within the meaning of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and its jurisdictional counterpart, 28 U.S.C. § 1343(3), and the appellee State of New York claims not to be a proper defendant under 42 U.S.C. § 1983, as well as immune under the eleventh amendment of the United States Constitution. The court below, finding that the cooperative shares involved were not "securit[ies]," dismissed the counts of the amended complaint alleging violations of the federal securities laws as to all defendants and, since the federal securities allegations represented the only "well pleaded" underlying basis for jurisdiction under the Civil Rights Act, dismissed the complaint as to the state agency. The remaining counts were dismissed as against the named defendants, since they set forth pendent claims asserted pursuant to state law. United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The complaint was therefore accordingly dismissed in its entirety for lack of subject matter jurisdiction. 366 F.Supp. 1117 (S.D.N.Y.1973). Expressing no opinion whatsoever on the merits, but finding jurisdiction nevertheless, we reverse and remand.

Appellants are 57 residents owning some 30 apartment units in Co-op City, a huge low-middle income cooperative housing project located in the borough of the Bronx, New York City. Co-op City is apparently the largest cooperative housing development in the United States, presently housing some 45,000 people, with more than 30 high-rise buildings and 230 town houses and a total of 15,400 apartment units ranging from three to seven rooms, on a 200-acre site. Appellants allege on behalf of themselves and all other residents violations by the defendants of the antifraud provisions of the Securities Act of 1933, 15 U.S.C. § 77q(a), and the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. The complaint alleges in respect to the defendant New York State Housing Finance Agency that plaintiffs' civil rights have been violated by virtue of the securities law violations alleged directly against the other defendants.

The corporate defendants, appellees here, include United Housing Foundation (UHF) which initiated and sponsored the project. UHF was formed in 1951 under New York's nonprofit corporation

---

[*] Senior United States District Judge for the District of Utah, sitting by designation.

1. New York Private Housing Finance Law §§ 10–37.

statute, New York Not-for-Profit Corporation Law, with the purpose of fostering the growth of nonprofit cooperative housing for low and low-middle income families and, in addition to Co-op City, it has participated in the sponsorship of several other New York cooperative housing projects; UHF's membership includes housing cooperatives, civic groups and labor unions. Community Services, Inc. (CSI), is the general contractor and sales agent for the project. CSI was organized under the New York Business Corporations Law, for profit, even though it is a wholly owned subsidiary of UHF. The third corporate defendant is Riverbay Corporation (Riverbay), which is the cooperative housing corporation in which plaintiffs purchased shares and which owns and operates the project. Riverbay was organized by UHF as a "mutual company" under New York's Mitchell-Lama Act, note 1, *supra;*[2] it is named as a defendant here principally, if not only, in respect to the derivative causes of action alleged on its behalf under New York state law. The individual defendants are officers or directors or both of some or all of the corporate defendants. Pursuant to the Mitchell-Lama Act, the defendant agency provided the bulk of the financing for the project through long-term low-interest mortgage loans, and the defendant New York State Division of Housing and Community Renewal (the "Division of Housing") through its commissioner is responsible for the supervision of the development, construction, promotion and operation of the project.

Basically under the Mitchell-Lama Act, cooperatives which are subsidized and supervised are owned by a mutual company formed under the Act the stock of which is held by the actual tenants, as here. Section 12(2–b). No one may live in the project whose probable aggregate income exceeds six times the rental

fees, § 31(2)(a), (b), and there is a preference to the aged, the handicapped and veterans, §§ 11, 31(7)(a), (b). Plaintiffs here secured their right to occupancy by completing a subscription agreement and apartment application form wherein they agreed to subscribe to 18 shares of Riverbay common stock at $25 par value per share for each room in the apartment they selected. Under the bylaws of Riverbay, each stockholder is entitled to only one vote on any and all matters regardless of the number of shares of capital stock or any other equity obligations of the housing company which the stockholder owns. Also, the stock may not be owned separate and apart from actual occupancy in Co-op City, nor may it be pledged or otherwise encumbered. The shares descend intact (together with the right to occupancy) only to a surviving spouse, and a tenant who wishes to move out or is forced out, whether by way of violation of the lease or by virtue of his income, must divest himself of the stock by offering it for repurchase, in which case he will be compensated with exactly the amount he paid for the stock. In the event Riverbay does not exercise its right to repurchase (for which it had established a reserve fund of approximately $917,000 as of December 31, 1972), the stockholder is free to sell his shares elsewhere, although under § 31–a of the Mitchell-Lama Act he may not sell them for more than the original purchase price plus a pro rata fraction of the mortgage amortization paid during his tenure at Co-op City.

The obligations of the Co-op City resident flow from his lease, not from his stock. In addition, to what the trial court has termed the usual landlord-tenant covenants with respect to services and care of the premises, the resident is required to pay annual carrying charges pro rated in advance monthly payments, the pro rata portion being based not on

---

2. The act essentially provides for the creation of "limited profit housing companies," § 13, which, subject to state or local supervision, may borrow up to 95 per cent of the project cost at low interest from the state or a municipality to construct and operate the project, rent apartments therein, etc. Sections 22, 27–31. Tax exemptions are provided, § 33, as is the right of condemnation on behalf of a municipality for the cooperative company, § 29.

the number of shares owned but on the size, type and location of his apartment. This monthly payment is, as in the case of other cooperatives, in reality rent, that is to say, it represents a proportionate allocation of the expenses of Riverbay in connection with the ownership, maintenance, operations, taxes, mortgage indebtedness, repairs improvements, wages for employees, etc.

The gravamen of the appellants' amended complaint relates to the carrying charges for Co-op City apartments, and particularly the initial "Information Bulletin" circulated by CSI as sales agent for Riverbay through the mail, originally setting forth an estimated average monthly carrying charge of $23.02 per room. This meant that a prospect for a four-room apartment could expect to pay $1,800 for stock in Riverbay and a monthly rent thereafter of $92.08. The cost of the project, however, increased while it was being built, and in 1968 the current "Information Bulletin" was revised upward to $25 per room per month, then in 1970–72 to $29.39, then in 1973–74, $35.27. Because it is now estimated that the charge will be $39.68 effective July 1, 1974, what originally was a $92.08 monthly rental bargain for a four-room apartment will now be $148.72 per month. For those who have fixed incomes or whose wages have not gone up with inflation, the change in carrying charges is most serious.[3] The complaint charges in substance that there were misrepresentations and material omissions in the "Information Bulletins." It is said, for example, that there was stated a lump sum price of $258,678,000 for the construction of the project to be financed with a $250,-

000,000 mortgage from the agency, and the Bulletin did go on to state that "the risk of completing the construction within the lump sum price is on the contractor." However, it is alleged, the agency and other defendants agreed to a final construction bill of $340,500,000, which was financed through a $125,000,000 increase in the mortgage loan, thereby substantially increasing the carrying charges.[4] Some other allegations apparently are that the "Information Bulletins" failed to disclose that the State Housing Commissioner had waived the liquidity requirement for contractors imposed by the Guide for Development of Limited Profit Housing, Preliminary Submissions, State of New York Division of Housing and Community Renewal p. 35, and further failed to disclose that the contractor was a wholly owned subsidiary of UHF.

As stated above, the district court determined that the shares in Riverbay were not securities within the meaning of the federal securities laws, and therefore the court was without jurisdiction over the claims. This holding we reverse for reasons which follow, finding the Riverbay shares to be securities within the federal law and thus conferring federal jurisdiction over appellants' claims. As to the substance of those claims, whether they state claims for which relief can be granted or whether any damages are cognizable, as we have said, we intimate no conclusion.

The definition of "security" in the Securities Exchange Act of 1934, § 3(a)(10), 15 U.S.C. § 78c(a)(10), is set out in full in the margin,[5] but for our

---

3. At the same time, because the maximum income eligibility is related to carrying charges, there has been a proportionate increase therein, so that, as the district court pointed out, for tenants who are employed it is possible that little or no real hardship has occurred.

4. Of course, on the merits the appellees would point out that the "Information Bulletins" state that the lump sum price is subject to addition or deduction for change orders during the progress of construction and that they also

warn that it is possible that increases in costs may increase the average monthly estimate.

5. 15 U.S.C. § 78c(a)(10):

The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, cer-

purposes may be read as follows: "The term 'security' means any . . . stock . . . investment contract . . . or in general, any instrument commonly known as a 'security'. . . ." The definition in the Securities Act of 1933, 15 U.S.C. § 77b(1), is "virtually identical" and interchangeable with that in the 1934 Act. Tcherepnin v. Knight, 389 U.S. 332, 335–336, 88 S.Ct. 548, 19 L.Ed. 2d 564 (1967); Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027, 1034 (2d Cir. 1974).

■ It should be mentioned that shares have not yet been issued to the appellants. For all purposes, however, we may treat the case as if the shares had been issued. Appellants have all signed the extensive subscription agreement under which they subscribe to class B capital stock of Riverbay Corporation at par value (the number of shares depending on the number of rooms in the apartment), and they all agreed to pay the full subscription price on the signing of the application. We agree with the court below (and the appellees do not seriously contend otherwise) that despite a contrary statement in the subscription agreement.[6] the tenants of Co-op City have purchased the right to own shares, and that is enough under the federal statutes to bring them within their coverage. 15 U.S.C. § 78c(a)(13).[7] In total the shareholders of Riverbay have paid $32,803,200 for their stock.

Some incidents of ownership of Riverbay common stock are identical to those of other cooperative real estate corporations' stock. The owner of the certificate has the right to vote in the affairs of the corporation.[8] He has the right to take income tax deductions for a portion of his monthly carrying charges. He has the right to enter into an occupancy agreement and his shares upon his death pass to his spouse together with the right to occupy. Rental income from Riverbay's leases of commercial and office space is available to pay its general expenses, thereby reducing its need for carrying charge income from the appellants. Other aspects of Riverbay stock are common but not universal. For instance, the stock may not be pledged or otherwise encumbered or owned by someone who does not occupy one of the cooperative apartments. *Cf.* Penthouse Properties, Inc. v. 1158 Fifth Avenue, Inc., 256 App.Div. 685, 11 N.Y.S.2d 417 (1st Dep't 1939). If a stockholder wishes to sell or must sell, Riverbay has the right of first refusal to purchase. More unusual is the provision that the right of repurchase by Riverbay is at the *original* purchase price. Even this, however, is not a unique provision. *See, e. g.,* Allen v. Baltimore Tissue Corp., 2 N.Y.2d 534, 161 N.Y.S.2d 418, 141 N.E.2d 812 (1957). Thus it can be seen that basically the stock here is similar to that of other cooperative real estate corporations. Such

tificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

6. The application states that the stock is not to be issued or delivered until the project has been completed and a certificate of acceptability to the housing company has been issued by the commissioner. It also states that "Until so issued and delivered, the Sub-

scriber shall not be deemed to be a stockholder nor the holder of any other equity obligation of the Housing Company." Paragraph (5).

7. 15 U.S.C. § 78c(a)(13) provides: "The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire."

8. While the owners do not, as is usually the case, have a separate vote for each share held, instead having one vote per apartment, this would have little, if any, functional difference where here one has one vote among some 45,000 and where otherwise the maximum one could have would be 126 votes (18 shares times seven rooms) of over one million. In either case any individual's vote or votes would not be terribly significant.

stock has recently been held to be a security under the Securities Acts. 1050 Tenants Corp. v. Jakobson, 365 F.Supp. 1171 (S.D.N.Y.1973), appeal pending.

■ One basis for such a finding is the so-called literal approach. *See* Jennings & Marsh, Securities Regulation 299–300 (3d ed. 1973); Note, Cooperative Housing Corporations and the Federal Securities Laws, 71 Colum.L.Rev. 118 (1971); Sobieski, Securities Regulation in California: Recent Developments, 11 U.C.L.A.L.Rev. 1, 7–8 (1963); Wenig & Schulz, Government Regulation of Condominiums in California, 14 Hastings L.J. 222, 233 (1963). According to this approach the fact that "stock" certificates are used in a "stock" corporation is sufficient in itself to bring transactions in the "stock" within the literal definition of the Acts. As Jennings & Marsh state at 299–300, "When a stock corporation is used, the securities acts literally apply, even though the profit motive is not dominant." Professor Loss has put it, "When the ownership of an individual apartment is evidenced by stock in the cooperative, as it usually is, the federal and state securities statutes would seem literally to apply." 1 L. Loss, Securities Regulation 492–93 (2d ed. 1961) (footnotes omitted). Judge Mansfield as a district judge supported the literal application of specific definitions of securities so as to *include* instruments within the coverage of the acts. Movielab, Inc. v. Berkey Photo, Inc., 321 F. Supp. 806 (S.D.N.Y.1970), aff'd, 452 F.2d 662 (2d Cir. 1971). The Supreme Court said in SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344, 351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943), reaffirmed in Tcherepnin v. Knight, 389 U.S. at 339, 88 S.Ct. 548,

> In the Securities Act the term "security" was defined to include by name or description many documents in which there is common trading for speculation or investment. Some, such as notes, bonds, and stocks, are pretty much standardized and the name alone carries well-settled meaning. . . . *Instruments may be included within*

*any of these definitions, as matter of law, if on their face they answer to the name or description.* However, the reach of the Act does not stop with the obvious and commonplace. . . .

(Emphasis added.) This language gives support to the proposition that if a given instrument is a share of stock "on its face" it is literally within the ambit of the statute. Expansive or interpretive readings given to other definitions within the Act, principally "investment contracts," generally have been to bring debatable transactions *within* the statute's coverage. It may be argued, moreover, that there is some underlying justification for such a formal approach. That is, where one utilizes the outward and traditional manifestations of a "stock" organization, the buyer may be led to believe that what he is buying is "stock" as normally considered and which would be protected by the federal or state securities laws. Indeed, the buyer of the purported "stock" may rely to some extent on the notion that he will at least be protected by those laws. It would be anomalous, the argument runs, were one who was defrauded as to the nature of the instrument, "stock" on its face, to be deprived of antifraud provisions directed at "stock" transactions.

■■ Appellees, nevertheless, argue that we must examine the context in which the instrument in question arose and whether that context warrants a literal application of the terms of this statute, for the definitional section, § 3(a) of the 1934 Act, 15 U.S.C. § 78c(a), commences:

> (a) When used in this chapter, *unless the context otherwise requires*—
>
> . . . . . . .
>
> (10 [definition of security]

(Emphasis added.) There is no doubt that the 1933 and 1934 Acts arose in the first instance in connection with the regulation of conduct in commercial marketplaces primarily to require disclosure of financial information for the protection of investors, curbing excessive speculation, market manipulation and the

like. *See* H.R.Rep.No.1383, 73d Cong., 2d Sess. 2 (1934) ; S.Rep.No.792, 73d Cong., 2d Sess. 3–5 (1934). And as SEC v. C. M. Joiner Leasing Corp., 320 U.S. at 351, 64 S.Ct. at 123, said, "the term 'security' was defined to include by name or description many documents in which there is common trading for speculation or investment." Thus while form has been disregarded for substance customarily in *extending* coverage of the Act, Tcherepnin v. Knight, 389 U.S. at 336, 88 S.Ct. 548, there is still substantial authority for the proposition that substance should govern rather than form even to restrict coverage of the Acts. *See* 1 Loss, *supra,* at 493 ("just as some things which look like real estate are securities, some things which look like securities are real estate"). Lino v. City Investing Co., 487 F.2d 689 (3d Cir. 1973) (promissory notes given in part payment of purchase price by franchise purchaser held not to be security). *See also* SEC v. Fifth Avenue Coach Lines, Inc., 289 F.Supp. 3 (S.D.N.Y.1968) (note given for personal loan), aff'd without consideration of the point, 435 F.2d 510 (2d Cir. 1970).

However, appellees would be no better off were we to agree with them that we must look through form to substance even where the result is to limit coverage of the Act.[9] Interestingly, although the SEC has not said whether it is treating cooperative shares formally as stock or substantially as "investment contracts," by Rule 235 of the General Rules and Regulations under the Securities Act of 1933, 17 C.F.R. § 230.235, the SEC has exempted from registration the stock of certain cooperative housing corporations and thereby implicitly recognized that other cooperative housing securities might be subject to other provisions of the securities laws. *Cf.* Tcherepnin v. Knight, 389 U.S. at 341–342, 88 S.Ct. 548. *See also* SEC v. Associated Gas & Electric Co., 99 F.2d 795, 798 (2d Cir. 1938).

To look to the substance of the term "stock" is in essence to determine if an "investment contract" of some sort exists. The basic test to ascertain the presence of an "investment contract" was formulated by the Supreme Court in SEC v. W. J. Howey Co., 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946) :

> In other words, an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. . . .

Appellees argue, as the trial court found, that there is no promise, expectation or possibility of profit[10] in connection with a member's resale of Riverbay's cooperative shares, and that this "nonprofit nature" together with the "noncommercial nature" of the development and the "rigid statutory controls" over the enterprise compel the conclusion that the shares are not "investment contracts" and hence securities under the federal laws. While these arguments are not without legal support, we are not persuaded by them. Before considering the question of profit, there is no doubt that in the words of *Howey* there was here a "transaction

9. We note that the Supreme Court continues to remind us that Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes." Affiliated Ute Citizens v. United States, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972) ; Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 12, 92 S.Ct. 165, 30 L. Ed.2d 128 (1971) ; SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186, 84 S. Ct. 275, 11 L.Ed.2d 237 (1963). We also note that cooperative stock is subject to the Blue Sky laws of many states, including those of New York, as acknowledged by the court below, 366 F.Supp. at 1121 n. 10. *See* New York General Business Law § 352–e.

10. Appellees would use that term mechanically or literally and not in the sense of "economic inducement" that the Court referred to in SEC v. C. M. Joiner Leasing Corp., 320 U.S. at 352–353, 64 S.Ct. 120. *See also* SEC v. United Benefit Life Ins. Co., 387 U.S. 202, 211, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967).

or scheme whereby a person invests his money in a common enterprise" and that if there is any expectation of profits at all that these would come "solely from the efforts of the promoter or a third party."

██ The harder question is, of course, whether there is any expectation of profit by appellants. Initially it must be conceded that there is no possible profit on a resale of the stock. If Riverbay does not buy the stock back at its original price the shareholder can only sell it for the original price plus a fraction of his pro rata amortization of the mortgage. Private Housing Finance Law § 31–a. Profit, however, need not be realized only in capital appreciation; equally important is the possibility of income from the investment. Here the shareholders have an expectation of "income" in at least three ways. First, and most directly, the tenant shareholders are able to share in the income from the leasing of retail establishments, office space, parking, and other commercial enterprises on the premises. The retail stores allegedly pay some $1,106,000 in rent to Riverbay. Income from renting office space and from coin-operated washing machines is stated to be $667,000 annually. Finally, some $2.5 million per year in parking fees is apparently collected from both tenants and others. In short, the shareholders may share—through the corporation—in substantial income. Admittedly, this income is not likely to come in the form of a dividend check (although according to the law dividends may be paid after all costs and expenses have been paid, *see* Private Housing Finance Law § 28) but rather in the form of reduced carrying charges to shareholder/tenants. The form that this income takes, however, is not determinative; in either case the shareholders are receiving a direct monetary benefit and as such, "profit" within the *Howey* concept. *See* 1050 Tenants Corp. v. Jakobson, 365 F.Supp. at 1176. *See also* Davenport v. United States, 260 F.2d 591 (9th Cir. 1958), cert. denied, 359 U.S. 909, 79 S.Ct. 585, 3 L.Ed.2d 573 (1959) (purchasers of cooperative memberships promised job se-

curity in plant to be constructed); SEC v. American Foundation for Advanced Education, 222 F.Supp. 828 (W.D.La. 1963); Silver Hills Country Club v. Sobieski, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961) (Traynor, J.); 1 L. Loss, *supra*, at 493–94; Zammit, Securities Law Aspects of Cooperative Housing, 169 N.Y.L.J. No. 5, at 1, col. 3 (Jan. 8, 1973); Note, *supra*, 71 Colum. L.Rev. at 129–31.

Another way of realizing income through the ownership of shares in Riverbay is the ability to partake of certain tax benefits—notably a deduction for a pro rata share of the mortgage interest payments. Investment schemes whose purpose is to provide tax losses and thereby generate deductions are usually reserved for the well-heeled, but here the opportunity to make tax savings, even for those in a low bracket, is a substantial inducement to buy shares, where the alternative is the payment of rent with no tax benefits. *See* 1050 Tenants Corp. v. Jakobson, 365 F.Supp. at 1176.

A third way in which it might be viewed that profits may be realized is in the saving of an expense which would otherwise necessarily be incurred. In other words, where the going rate for rents in a given area is one amount, an investment opportunity offering housing at an amount substantially below that going rate is an offer of a "profit," for housing is a necessity and any saving on that necessity is money in one's pocket. While the state cases are, of course, not binding upon us, we incline to agree with State ex rel. Troy v. Lumbermen's Clinic, 186 Wash. 384, 394–395, 58 P.2d 812, 816 (1936):

> A saving of expense which would otherwise necessarily be incurred is also a profit to the person benefited. If respondent renders to its incorporators or members, or to businesses in which they are interested and in whose profits they share, a service at a cost lower than that which would otherwise be paid for such service, the respondent's operations result in a profit to its members.

*See also* Pine Grove Manor, Inc. v. Director, 68 N.J.Super. 135, 171 A.2d 676 (Super.Ct.App.Div.1961); Commonwealth v. 2101 Cooperative, Inc. (No. 1), 27 Pa.D. & C.2d 405 (C.P.1961), aff'd per curiam, 408 Pa. 24, 183 A.2d 325 (1962); State ex rel. Russell v. Sweeney, 153 Ohio St. 66, 41 Ohio Op. 143, 91 N.E.2d 13 (1950). Viewing the savings, which were promised here by appellees, over rents for comparable accommodations as "profits" as well, we find a contract for an investment, which carried with it a risk of loss of that investment, to be an investment contract under the Securities Acts.

The fact that the shares are issued and sold by a nonprofit corporation is in and of itself immaterial; certainly if the corporation went bankrupt, the shareholders would have sustained a loss in the amount of their investment, and there is nothing to say that a nonprofit corporation necessarily must not go bankrupt. Nor is there anything in the nonprofit nature of a corporation which provides assurances that it will not deceive and defraud buyers or owners of shares.

 The fact, too, that the cooperative was created and remains under considerable general supervision of the State of New York through its Housing Agency and Commissioner of the Division of Housing surely does not remove the stock from the federal Securities Acts' ambit. In the first place, many of their regulatory duties are aimed at preserving the quality of the assets supporting the mortgage loan. Their principal purpose thus is not necessarily to protect the shareholders. Indeed, there are any number of industries such as public utilities that are at least as closely regulated by the State as are the sponsor, contractor and cooperative company here and whose stock is clearly subject to federal regulation. Nor does the fact that there are eleemosynary elements underlying the statute, perhaps indeed underlying the

services rendered by the nonprofit sponsor, UHF, take the case from without the protection of the securities laws. Indeed, the for-profit subsidiary of UHF, CSI, the contractor here, could very well stand to benefit substantially by the price paid to it for its contracting services, the very point at issue under the appellants' pleadings.[11] The fact that there may be no profit motive on the part of the promoter, UHF, does not by any means affect the profit motives on the part of the subscribers above referred to, nor would it necessarily affect the profit motive on the part of the contractor, the directors and officers of whom might conceivably—were they evil men—be receiving considerable compensation. Nor would the lack of a profit motive eliminate the incentive for fraudulent or deceptive practices in the sale of cooperative stock. Whether it were to recoup advances already made or to retain a particular reputation even a nonprofit entity may encounter pressures which might have the tendency to change an otherwise objective and fair sales pitch to something likely to entice and mislead.

We hold, then, that a share in Riverbay is both "stock" and an "investment contract" under the Securities Acts. We pass to the special defenses of the State Housing Finance Agency and of the State of New York.

 The State Housing Finance Agency argues that it may not be charged with violation of § 1983. While municipal corporations, that is, municipalities, are not deemed "persons" under the Civil Rights Act, *see* Monroe v. Pape, 365 U.S. 167, 187–190, 81 S.Ct. 473, 5 L.Ed.2d 492 (1960), "agencies" have always been so deemed. *See, e. g.,* Escalera v. New York City Housing Authority, 425 F.2d 853 (2d Cir. 1970), cert. denied 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1971); Holmes v. New York City Housing Authority, 398 F.2d 262 (2d Cir. 1968). The agency here moreover, is not pro-

---

11. This, of course, is a question on the merits, in the event that a claim is actually stated for which relief can be granted, as to which we express no opinion.

tected by sovereign immunity. First, Private Housing Finance Law § 32(5) [12] expressly waives sovereign immunity for the agency. Even were such a waiver absent, the agency is not an "alter ego" of the state, see Whitten v. State University Construction Fund, 493 F.2d 177 (1st Cir. 1974) (Moore, J.), and hence not a recipient of sovereign immunity. The State Housing Finance Agency has the express authority to sue and be sued; it acts only as a credit or financing entity; it apparently has no power to take property in its own name or in the name of the State. In *Whitten* the court found "ultimate State liability" to be the most crucial determination. Here the State is expressly *not* liable for the debts of the agency. Private Housing Finance Law § 46(8). Thus, upon these considerations it would appear that the agency here is sufficiently independent of the State as not to enjoy sovereign immunity. *Compare* Matherson v. Long Island State Park Commission, 442 F.2d 566 (2d Cir. 1971) (Jones Beach Parkway Authority not alter ego); Zeidner v. Wulforst, 197 F.Supp. 23, 25 (E.D.N.Y.1961) (New York Thruway Authority not alter ego); In re Dormitory Authority, 18 N.Y.2d 114, 271 N.Y.S.2d 983, 218 N.E.2d 693 (1966) (Dormitory Authority of State of New York has no sovereign immunity); Story House Corp. v. Job Development Authority, 37 A.D.2d 345, 325 N.Y.S.2d 659 (3d Dep't 1971), aff'd mem., 31 N.Y.2d 942, 340 N.Y.S.2d 929, 293 N.E.2d 97 (1972) (State of New York Job Development Authority has no sovereign immunity), *with* Whitten v. State University Construction Fund, *supra* (State University Construction Fund has sovereign immunity; Charles Simkin & Sons, Inc. v. State University Construction Fund, 352 F.Supp. 177 (S.D.N.Y.), aff'd mem., 486 F.2d 1393 (2d Cir. 1973) (State University Construction Fund has sovereign immunity); State University of New York v. Syracuse University, 206 Misc. 1003, 137 N.Y.S.2d 916 (Sup.Ct.), aff'd, 285 App. Div. 59, 135 N.Y.S.2d 539 (3d Dep't 1954) (State University has sovereign immunity).

The State itself argues that the court below lacks jurisdiction over it. Again, however, the State has expressly waived sovereign immunity in Private Housing Finance Law § 32(5), note 12 *supra*. Secondly, the State has waived its sovereign immunity with respect to federal securities laws violations by voluntarily entering a field under federal regulation. *See* Parden v. Terminal Railway of Alabama Docks Department, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). Thus when the State enacted the Mitchell-Lama Act in 1955 and codified it in 1961, it did so with the knowledge that transactions involving subscriptions for stock solicited through the mails were already within the ambit of federal antifraud regulations and statutes. To paraphrase the court's opinion in *Parden,* 377 U.S. at 192, 84 S.Ct. 1207, by enacting the federal securities laws in the exercise of the Commerce Clause—a power given to the federal government by the states in adopting and ratifying the constitution— the Congress conditioned the right to be involved in the sale and distribution of securities upon amenability to suit in federal court as provided by those regulatory laws.[13] Were there any doubt that the

---

12. Section 32(5):
 With regard to duties and liabilities arising out of this article the state, the commissioner or the supervising agency may be sued *in the same manner as a private person.* No costs shall be awarded against the commissioner, the state, or the supervising agency, as the case may be, in any such litigation. (Emphasis added.)

13. Employees v. Missouri Public Health Dept., 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), is distinguishable. There, unlike this case and *Parden,* the state's activity came first, the federal regulation second. In this posture, the Court held, the state could not be found to have waived its immunity; rather Congress would be required explicitly to override it. Here and in *Parden,* however, the

securities laws were intended to reach states or their agencies, the legislative history dispels it. *See* H.R.Rep.No.85, 73d Cong., 1st Sess. 11.

Again, in reversing the district court we make no suggestion regarding the viability of appellants' claims, except to find that the cooperative shares involved are securities so as to confer jurisdiction on the federal court.

Judgment reversed and remanded.

regulatory system was in effect before the state entered the field. That entry into the regulated field thus constituted a waiver of the state's immunity.